Herbert I. BROWN, Plaintiff, Appellant,
v.
WESTERN MASSACHUSETTS THEATRES, INC., Defendant, Appellee.

No. 5715.

United States Court of Appeals
First Circuit.

March 10, 1961.

Rehearing Denied April 24, 1961.

---

George S. Ryan, with whom W. Bradley Ryan and Ryan & Ryan, Boston, Mass., were on the brief, for appellant.

Philip M. Cronin, Boston, Mass., with whom Charles E. Gennert, Boston, Mass., Samuel T. Tisdale, Greenfield, Mass., Withington, Cross, Park & McCann, Boston, Mass., and Hesselton & Tisdale, Greenfield, Mass., were on the brief, for appellee.

Before HARTIGAN and ALDRICH, Circuit Judges, and JULIAN, District Judge.

ALDRICH, Circuit Judge.

■ This is an action under the Sherman and Clayton Acts. 15 U.S.C.A. § 1 et seq. At the close of the plaintiff's case the court ordered a verdict for the defendant. The only question of moment on this appeal is whether the evidence warranted a finding that defendant Western Massachusetts Theatres, Inc., conspired with several other named parties to monopolize and restrain trade in the exhibition of first-run [1] motion pictures in Greenfield, Massachusetts. The plaintiff is the operator of the Victoria, a motion-picture theatre in Greenfield, and defendant owns a chain of such theatres, including one in Greenfield, the Garden. The alleged coconspirators were the M. A. Shea Massachusetts Corp.,[2] also an owner of a chain of theatres, including the Lawler, the remaining theatre in Greenfield, and nine major motion-picture distributors.[3] The gist of the com-

---

1. "First-run," as used in the motion-picture industry, means the first exhibition of a picture in a given area. See United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 144 note 6, 68 S.Ct. 915, 92 L.Ed. 1260.

2. Shea withdrew its appearance and was defaulted in this suit.

3. Columbia Pictures Corp, Loew's, Inc., Paramount Film Distributing Corp., Republic Pictures Corp., RKO Radio Pictures, Inc., Twentieth Century-Fox Film Corp., United Artists Corp., Universal Film Exchanges, Inc., Warner Bros. Pictures Distributing Corp. These distributors were dismissed by stipulation after settling with plaintiff in exchange for a covenant not to sue. Under familiar principles, we do not regard this as an admission.

plaint is that the distributors jointly agreed with the exhibitors, Western and Shea, to divide the bulk of their first-run product between the Garden and the Lawler, thus depriving plaintiff of an opportunity to obtain the supply of first-run films needed for effective competition by the Victoria. As is not unusual in a case of this kind, plaintiff attempted to prove his allegations of conspiracy indirectly by inferences he claims can be drawn from certain conduct, rather than by direct proof of conspiratorial activities, joint agreements, or group decisions. We agree with the district court that his evidence fell short of the mark.

■ The most damaging evidence developed by the plaintiff tended to show that Western had utilized alternative or superseding bidding in competing for certain films. Western denied, and then attempted to explain away, this practice. We have no doubt, however, that a jury could have concluded that competitive bidding by the particular distributors in question was not always what it purported to be, or concluded that, in the instances shown, plaintiff's bids were not considered on an equal footing with defendant's. But the real issue is what legal significance could be attributed to such a finding. To determine this the status of competitive bidding in the motion-picture industry is a necessary background. In United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 161–166, 68 S.Ct. 915, the court set aside that part of the district court's decree which required first-run films to be distributed among exhibitors according to a competitive-bidding system. To a large extent the court's holding in this respect was based on its belief that it would often be impossible to evaluate the bids, and equally difficult to determine when a distributor's preference of one exhibitor over another, for reasons not appearing on the face of a bid, was an exercise of valid business judgment and not the result of illegal favoritism. Id., 334 U.S. at page 163, 68 S.Ct. at page 932. Of course this is not to question that competitive bidding is one acceptable method of distributing films for exhibition. But cf. id. 334 U.S. at pages 164–165, 68 S.Ct. at pages 932–933. It does indicate, however, why a departure from competitive bidding does not in itself constitute or prove a violation, and cannot be helpful to the plaintiff unless he can rationally relate it to other conduct by the alleged conspirators.[4]

Stripped to its essence, the remainder of plaintiff's evidence shows merely that plaintiff did not always have the amount and quality of first-run pictures available for exhibition that he would have liked,[5] or as many as the Lawler and the Garden;[6] that almost without exception the group of distributors supplying film to the Garden did not supply the Lawler, and vice versa; and that, in varying degrees, some of the distributors refused to consider bids by the plaintiff, or delayed in their willingness to do so. However, there was also undisputed evidence that plaintiff's Victoria, rather than being as desirable as its competitors, cf. Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 2 Cir., 1949, 176 F.2d 594,

4. It should be noted that the evidence as to dual bids was very sparse. Plaintiff introduced less than a dozen specific instances. One of these was a bid made for an MGM (Loew's) picture, and all of the others were for the films of Twentieth Century-Fox. While we will assume that on his complaint plaintiff would be permitted to show a conspiracy between defendant and any one or more of the named coconspirators, it is clear that his theory of damages would be destroyed if only one of two distributors were guilty. It would be difficult, if not impossible to relate this small amount of evidence, involving, at best, two distributors, to all nine.

5. Defendant introduced evidence tending to prove that during much of the time here relevant plaintiff had in fact all of the first-run he desired. But we think a jury could have found otherwise.

6. Defendant claimed that neither the Garden nor the Lawler were able to get all the first-run they wished. Plaintiff assumed this to be true when pointing out that neither tried to get the other's product.

was substantially smaller than either of the other theatres,[7] and was markedly inferior in quality, at least to the Garden; that its location was probably poorer, and at least no better; and that it had a long history of showing vaudeville and second-run pictures prior to plaintiff's taking over its management. In addition, there was considerable documentary evidence, not challenged or answered, indicating that plaintiff was a difficult, if not unreliable, man with whom to transact business. As a whole the record seems at least as consistent with legitimate business decisions by the distributors in favor of the Garden or the Lawler as with a planned exclusion of plaintiff from the first-run market. Nor is it necessarily significant that the several distributors all tended to prefer plaintiff's competitors, since these same business factors were relevant to each.

■■ Plaintiff makes the customary attempt to rely on the theory of consciously parallel action. But, as the Supreme Court has said, " '[C]onscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 541, 74 S.Ct. 257, 260, 98 L.Ed. 273. And in any event, something more than occasional similarity of conduct is required. In the case at bar the parallel behavior among the distributors begins and ends with the division of the several distributors' product between the other two Greenfield exhibitors, a practice commencing at a time before plaintiff had actively attempted to obtain part of this product for himself. Plaintiff cannot claim to be damaged by a denial of what he did not request. See Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 2 Cir., 1959,

268 F.2d 246, 251, certiorari denied 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121. As soon as he began to assert a right to bid for himself, he commenced receiving first-run movies. It is true that all distributors did not immediately recognize plaintiff's asserted "right," but the essence of his complaint is uniform repudiation and their varying responses to his demands was anything but uniform.[8] We would be slow to accept the argument that if everyone acts alike it shows conspiracy, but if they act differently it merely means concealment.

Parallel behavior as between Western and Shea continued through most of the relevant period in that neither attempted to bid against the other until near the end. If such parallel behavior could ever prove anything, it does not here. It was admitted by all that competitive bidding was suicidal for the exhibitors. The antitrust laws do not require a business to cut its own throat. Even plaintiff himself resisted three-way bidding, and, in place of this, all three exhibitors ultimately agreed on a division of the first-run movies of the several distributors.

We do not consider further the many cases involving the motion-picture industry cited by both parties as we think each case turns largely on its own factual background.

Judgment affirmed.

### On Petition for Rehearing.

Plaintiff's petition for rehearing suggests that he has not fully understood our opinion with regard to conscious parallelism. Whatever this term means, it must be something more than mutual awareness of similar conduct. This awareness must be an element entering into each party's decisional process, and the basis for inferring that it did so must

---

7. Plaintiff constantly refers to the fact that it is theoretically possible for a small house to gross more than a larger one on a given film by having a longer run. His argument, in addition to not having been testimonially connected to Greenfield, overlooks the fact that long runs delay the use of the print elsewhere.

8. Plaintiff conceded that on some distributors (not named as conspirators) he made no demands at all, and on others made no concentrated effort. This is not conclusive against the plaintiff, of course, since he may choose his product as he sees fit, but it further dispels the suggestion of a uniform response.

be something more substantial than a guess. For everyone to run out of the building when there is a cry of "Fire," or to stand in a queue at a bus stop, is not conscious parallelism. Plaintiff's misconception is revealed by his claim that conscious parallelism began the very day he sought to obtain first-run films. He must first show why or when reasonable distributors would have changed—not simply might have changed—before an inference can be drawn. Thereafter plaintiff finds himself with a picture of non-uniform change.

The petition for rehearing is denied.