**Lawrence H. AYERS, Plaintiff,**

**v.**

**PASTIME AMUSEMENT COMPANY, Albert Sottile, Consolidated Theatres, Inc., Paramount Film Distributing Corporation, Loew's, Incorporated, Twentieth Century-Fox Film Corporation, Warner Bros. Pictures Distributing Corporation, RKO Teleradio Pictures, Inc., United Artists Corporation, Universal Film Exchanges, Inc., Columbia Pictures Corporation, Defendants.**

**Lawrence H. AYERS and Ruth T. Ayers, Plaintiffs,**

**v.**

**PASTIME AMUSEMENT COMPANY, Albert Sottile, Consolidated Theatres, Inc., Paramount Film Distributing Corporation, Loew's, Incorporated, Twentieth Century-Fox Film Corporation, Warner Bros. Pictures Distributing Corporation, RKO Teleradio Pictures, Inc., United Artists Corporation, Universal Film Exchanges, Inc., Columbia Pictures Corporation, Defendants.**

**Civ. A. Nos. 6481, 6482.**

United States District Court
D. South Carolina,
Charleston Division.

April 16, 1968.

See also D.C., 259 F.Supp. 358.

Edward K. Pritchard, Pritchard, Myers & Morrison, Charleston, S. C., W. Bradley Ryan, Boston, Mass., for plaintiff.

J. C. Long, Arthur G. Howe, Charleston, S. C., for defendants.

## ORDER

SIMONS, District Judge.

Civil Action No. 6481 was commenced by the filing of a complaint on October 9, 1957, by plaintiff Lawrence H. Ayers, operator of the Summerville Theatre, Summerville, South Carolina, and the Holly Hill Drive-In Theatre, Holly Hill, South Carolina, against defendants seeking treble damages for alleged violation by defendants of the anti-trust laws of the United States, namely, the Sherman Anti-Trust Act, Title 15 U.S.C.A. Sections 1, 2 and 7, and the Clayton Act, Title 15 U.S.C.A. Sections 12, 15, 16 and 22. Jurisdiction of this court is provided for in these acts and is not in dispute.

Civil Action No. 6482, a companion action, was also commenced on October 9, 1957 by plaintiffs Lawrence H. Ayers and Ruth T. Ayers, operators of the Four Mile Drive-In Theatre, Charleston, South Carolina, against defendants, alleging violation of the Sherman and Clayton Anti-Trust Acts, supra, and seeking treble damages.

After his death the individual defendant Albert Sottile was voluntarily dismissed from both actions. In 1964 the eight national distributor defendants entered into a compromise settlement with plaintiffs in both actions whereby they collectively paid to plaintiffs a total of $42,500.00 on the basis of covenants not to sue, and were in due course dismissed with prejudice from both actions. In the covenants plaintiffs specifically reserved all claims and causes of action which they had against the remaining defendants in each action.

In January 1968 defendant Consolidated Theatres, Inc., entered into a compromise settlement with plaintiffs on the basis of a covenant not to sue whereby it paid to plaintiffs the sum of $7,000.00 and were dismissed from both actions with prejudice.

Presently the sole remaining defendant is Pastime Amusement Company, and the two actions are now before the court on this defendant's motion to dismiss each action against it upon the ground that the complaints fail to state claims upon which relief can be granted. The motion is supported by affidavits, various exhibits, the depositions in the record, and the pleadings. Upon the hearing of the motion it was stipulated and agreed by counsel for the parties that defendant's motion should be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

The first count of the complaint in each action alleges a conspiracy of national significance to monopolize and restrain interstate commerce and trade in the distribution of motion pictures. At oral argument upon the motion plaintiffs' counsel stated that inasmuch as the eight national distributors had been eliminated as party-defendants, plaintiffs no longer seek to recover under count one of their complaints. It is therefore proper that Pastime's motion for summary judgment be granted as to count one in each complaint without further ado.

In Civil Action No. 6481 plaintiff Lawrence H. Ayers alleged a conspiracy involving defendant Pastime and the dismissed defendants as co-conspirators, which injured plaintiff in the operation of his drive-in theatres in Summerville and Holly Hill, South Carolina. The pertinent portions of count two of his complaint are as follows:

"2. (a) Prior to 1947 the defendants and various other persons and corporations entered into an unlawful combination and conspiracy, other than and different from the national conspiracy alleged in the first count of this complaint, to restrain and to monopolize interstate trade and commerce in motion picture films, particularly the right of the plaintiff and various independent exhibitors operating theatres in and near cities where theatres of the defendant exhibitors were located, to contract for and to exhibit said films within a reasonable time after national release date or territorial release date, without unreasonable or unlawful restrictions against them in favor of the theatres of the defendant exhibitors and in other ways and by other means unlawfully to discriminate against the said independent exhibitors, including the plaintiff, in favor of the defendant exhibitors.

"(b) The purpose and intent of said combination and conspiracy were and are to minimize, suppress and destroy competition in contracting for and exhibiting films in and near the said city of Charleston, and in the said towns of Summerville and Holly Hill and in other cities where theatres of the defendant exhibitors were located; to establish and maintain a uniform struc-

ture of runs, clearance and admission prices in and near the said cities; to induce the public to attend the exhibition of films at the theatres of the defendant exhibitors, and to prevent them from attending the theatres of the plaintiff and other independent exhibitors; to cause the theatres of the plaintiff to be operated at a financial loss, and ultimately to force independent exhibitors, including the plaintiff, to retire from business; and to establish and maintain a monopoly in the said defendant exhibitors of the prior right to contract for and to exhibit motion picture films in and near the said cities.

"3. By reason of the aforesaid combination and conspiracy of the defendants, and of their acts and practices in pursuance of it, and of the monopoly and restraint of trade created thereby, the plaintiff has been grievously injured and damaged in his business and property. At all times he has been ready, able and willing to contract in the usual course of interstate commerce for licenses to exhibit motion picture films of the defendant distributors on or shortly after national release date or territorial release date, without unreasonable or unlawful restrictions against him, but the defendant distributors have refused to enter into contracts with him or to permit him to exhibit their films, except upon the condition that they should not be exhibited until the lapse of long periods of time after their exhibition in the theatres of the defendant exhibitors and in other theatres in the said city of Charleston and in the said towns of Summerville and Holly Hill. He has been compelled to pay excessive and unreasonable prices for films of the defendant distributors exhibited by him. He has lost the patronage of the public to a considerable degree and has suffered serious and permanent damage to the goodwill of his business. By reason thereof the plaintiff was unable to continue the operation of said theatres and was com-pelled to cease operation at the times stated in paragraph 21 of count 1 of this complaint. Since that time he has incurred necessary expenses in connection with the maintenance and ownership of said theatres; and he has lost profits and sustained losses he would not have lost or sustained except for the aforesaid unlawful combination and conspiracy."

Plaintiff demands judgment against defendant in count two of this complaint for one million dollars ($1,000,000) damages, attorneys' fees and costs.

In Civil Action No. 6482 plaintiffs Lawrence H. Ayers and Ruth T. Ayers allege in Count two of their complaint a conspiracy of defendant Pastime and the dismissed defendants as co-conspirators, which injured plaintiffs in the operation of their Four Mile Drive-In Theatre located approximately one and one-half miles from the city of Charleston. The allegations of Count two of plaintiffs' complaint in this action are substantially the same as those quoted hereinabove from Count two of the complaint in Civil Action No. 6481. Plaintiffs seek judgment against defendants for Three Hundred Fifty Thousand Dollars damages, attorneys' fees and costs.

Defendant Pastime duly answered the complaints in each action denying all of the material allegations thereof.

During the ten-year period of the pendency of these actions numerous depositions, exhibits, and affidavits have been filed by the parties, which indeed constitute a voluminous record. Included among depositions on file are the following: Lawrence H. Ayers and Ruth T. Ayers, plaintiffs; H. J. Meyers, vice president and general manager of defendant Pastime; Frank H. Bedenfield, executive vice-president of former defendant Consolidated Theatres, Inc.; Ulmer Eaddy, film buyer of Consolidated Theatres, Inc.; branch managers of the former defendant distributors Paramount Film Distributing Corporation, Warner Bros. Pictures Distributing Corporation, Columbia Pictures Corporation and

Loew's, Incorporated. Also on file are affidavits of H. G. Meyer and Frank Bedenfield in support of defendant Pastime's motion for summary judgment. Plaintiffs have also filed counter-affidavits of plaintiff Ruth T. Ayers in opposition to defendant's motion for summary judgment. Also all of Pastime's contracts with distributors in reference to the booking of their film at its theatres have been made available and inspected by plaintiffs' counsel. Plaintiffs' counsel have also inspected such other of Pastime's records as they desired, including the correspondence between Pastime and the distributors and their representatives.

Furthermore, numerous motions have been made and considered by the court, and orders entered which deal with varied aspects of the litigation. Subsequent to the dismissal of the eight national distributor defendants which left only Pastime and Consolidated Theatres, Inc. as party-defendants the case was tentatively set for jury trial during January 1967. Prior to the trial date District Judge Larkins of the Eastern District of North Carolina, on December 29, 1966, granted summary judgment in favor of the defendants in the case of Seago v. North Carolina Theatres, Inc., et al., by order reported in 42 F.R.D. 627. Many of the defendants in that case were also defendants in these cases, and W. Brantley Ryan of Boston, Massachusetts, of counsel for plaintiffs in *Seago*, is also the lead counsel for plaintiffs herein. Immediately after learning of the district court decision in *Seago*, counsel for Pastime and Consolidated Theatres, Inc., moved to dismiss these actions against their clients. Thereupon counsel for plaintiffs, and Pastime and Consolidated urged the court to delay a hearing on these motions and the trial until after the decision of the Fourth Circuit Court of Appeals in the appeal which plaintiff took from Judge Larkins' order in *Seago*.

On September 25, 1967 the Fourth Circuit in a *per curiam* order sustained Judge Larkins stating "The judgment is affirmed on the district Court's opinion in 42 F.R.D. 627 (E.D.N.C.1967)." 388 F.2d 987. Thereafter plaintiff in *Seago* petitioned the Supreme Court of the United States for a writ of certiorari which was denied on March 4, 1968. 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968).

Oral arguments on Pastime's motion for summary judgment were heard on February 29, 1968. At that time Pastime also moved to dismiss both actions on the further ground that they could no longer be maintained, inasmuch as all other defendants except it had been dismissed with prejudice and that it could not have conspired with itself. The court overruled this motion, and took under advisement defendant Pastime's motion for summary judgment,[1] which is now for determination pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Defendant Pastime Amusement Company hereinafter referred to as "Pastime" is a corporation duly organized by law having its usual place of business in the City of Charleston, South Carolina. It is a locally owned, independent theatre company which has in no way been connected with or controlled by any of the former defendant distributors. The latter have never owned stock in, nor had any control over the management and operation of Pastime. For a period of more than forty years Pastime has been engaged in the operation of motion picture theatres of the conventional type known as "brick and mortar theatres" in the city of Charleston. In this litigation the court is specifically concerned with the years from 1953 through 1957 when Pastime operated the Gloria, the Riviera, the Garden, the American, and the Arcade Theatres in the downtown area of

---

1. The court has been advised by plaintiffs' and Pastime's counsel that they are now ready to proceed with the jury trial as to count two of the complaints should defendant's motion for summary judgment be refused. Their varying estimates of trial time range from a minimum of three to a maximum of six weeks.

Charleston, and the Ashley Theatre in the area known as St. Andrews Parish in Charleston County, located just across the Ashley River west of the city.

The Gloria Theatre located at 327–29 King Street in downtown Charleston was constructed in 1928 and is owned by Theatre Realty Company. It has a seating capacity of 1400, is air conditioned and during all times in question in this litigation had the highest quality in projection and sound equipment, luxurious lounges and restroom facilities, together with a modern snack bar and concession stand. This theatre located in the heart of the downtown business section was leased to Pastime at a rental of $2500 per month during the years 1953 and 1954 and $2,000 per month during 1955 and 1956.

The Riviera Theatre built in 1938 is located at 227 King Street about five blocks from the Gloria Theatre. With a seating capacity of 1180 it is also owned by Theatre Realty Company and was leased to Pastime at a monthly rental of $2,000 during 1953 and 1954 and $1250 per month for the years 1955 and 1956. It too is a modern, up-to-date theatre having excellent projection and sound equipment and luxurious accommodations.

The Arcade Theatre built in 1951 with a seating capacity of 272 is located at No. 1–3 Liberty Street in downtown Charleston about one block from the Gloria Theatre. It is also owned by Theatre Realty Company, and was leased to Pastime at a monthly rental of $500 for the years 1953 and 1954 and $250 per month for the years 1955 and 1956. Although small this theatre has very fine accommodations and appointments.

The Garden Theatre is located on King Street in downtown Charleston about one block north of the Gloria Theatre with a seating capacity of 900. It was also modern in every respect and was leased to Pastime for a rental of $1500 a month for the years 1953 and 1954 and $1000 per month for the years 1955 and 1956.

The American Theatre built in the early 1940s is located about six blocks north of the Gloria Theatre and has a seating capacity of 830. It was also a modern and luxurious theatre which was leased to Pastime at a monthly rental of $1500.

The Ashley Theatre built in 1952 is located in Avondale, St. Andrews Parish. It has a seating capacity of 300 and was leased during the period in question to Pastime for a monthly rental of $250. It is the type known in trade as a "neighborhood theatre."

The former defendant Consolidated Theatres, Inc., hereinafter referred to as "Consolidated" is a corporation duly organized and has its usual place of business in the County of Charleston, South Carolina. For many years it has operated the Flamingo Drive-In, the North Fifty-two Drive-In, and the Magnolia Drive-In Theatres near the city of Charleston in Charleston County, South Carolina. It also operates about twenty-five other theatres in other parts of South Carolina and in North Carolina.

The former defendant distributors Paramount Film Distributing Corporation, Loew's, Incorporated, Twentieth Century-Fox Film Corporation, Warner Bros. Pictures Distributing Corporation, RKO Teleradio Pictures, Inc., United Artists Corporation, Universal Film Exchanges, Inc., and Columbia Pictures Corporation are corporations duly organized by law and have their principal places of business in New York City and transact business in the District of South Carolina. They were all national distributors of motion picture films during the period from 1950 through 1957 inclusive and for many years before. These former defendant corporations will hereafter be referred to as "distributors".

Each of the distributors had a branch office in Charlotte, North Carolina which generally served North and South Carolina in connection with the distribution of the distributors' films.

In the trade a "run" is an exhibition of a film in a given area, the first run being the first exhibition in the area, the second exhibition being the next, and so on. A "clearance" is a period of time usually specified in license contracts between a distributor and an exhibitor which must elapse between runs of the same feature within a particular area or within specified theatres. A motion picture is not sold by a distributor to an exhibitor, but is merely licensed for exhibition at a theatre for a certain period of time. "Booking" in the trade is the arrangement between distributor and the exhibitor of a particular date for exhibition of a picture already licensed to be exhibited.

Consolidated's North 52 Drive-In and Flamingo Drive-In Theatres are both located on Highway 52 north of the city limits of Charleston, approximately nine miles from Pastime's downtown theatres. Consolidated also operates the Magnolia Drive-In Theatre, located on Highway 17 about five miles south of Pastime's downtown theatres.

Plaintiffs Mr. and Mrs. Ayers operated the Four Mile Drive-In Theatre in North Charleston, South Carolina from about April 1950 to November 1957. This theatre was located approximately four miles from Pastime's downtown Charleston theatres, seven miles from Pastime's Ashley Theatre, eleven miles from Consolidated's Magnolia Drive-In Theatre and five miles from Consolidated's North 52 and Flamingo Drive-In Theatres. Plaintiff Lawrence H. Ayers operated the Holly Hill Drive-In Theatre in Holly Hill, South Carolina from about July 1947 to July 1955. It was approximately fifty-seven miles from Pastime's theatres and from forty-eight to fifty-seven miles from Consolidated's Magnolia Drive-In, North 52 and Flamingo Drive-In Theatres. Mr. Ayers also operated the Summerville Drive-In Theatre at Summerville, South Carolina from March 1948 to June 1956 which was approximately twenty-six miles from Pastime's downtown Charleston theatres and seventeen miles from Consolidated's North 52

and Flamingo Drive-In Theatres. He also operated the St. Andrews Drive-In Theatre in St. Andrews Parish from about June 1949 to October 1953. However, his operation of this latter theatre ceased prior to the four year damage period involved in this litigation and his claims in reference to this theatre, if any, are barred by the applicable statute of limitations.

Prior to the commencement of the operation of the foregoing named theatres neither Mr. nor Mrs. Ayers had ever had any prior experience in the motion picture business. All of their theatres were of the drive-in type, which represented by comparison to Pastime's theatres a very small investment on their part. None of them could be considered first class theatres, which could be expected to command first run pictures from any of the leading distributors. The Holly Hill Drive-In which represented a total investment of $9,000 had very meager facilities, including a small concession stand, and no restroom facilities (the only restrooms available to the patrons were located at a service station across the street). Further, the theatre was equipped with a blast-type speaker instead of individual speakers for each car. At his Summerville Drive-In Mr. Ayers had an investment of approximately $13,000 including land and equipment; and in his St. Andrews Drive-In Theatre his investment was $15,000, and he paid an annual rental of $300. Plaintiffs had a total investment in their Four Mile Drive-In Theatre in North Charleston of $18,000.

Based on sound business principles, the pictures of each of the distributors were generally exhibited on a first-run basis in the city of Charleston, which was recognized in the trade as a "key city," at one of Pastime's downtown theatres with "clearance" over all other theatres, including those of Consolidated, plaintiffs and other exhibitors in the area. Frequently Pastime also exhibited the films of the distributors on a second run basis in Charleston generally at its Ashley, Arcade and American Theatres. It also

sometimes exhibited pictures of the distributors on a so-called "move over" run, which means that a picture was moved from one of its theatres to another after the contract time at the first theatre had ended. This was done because the public reception of the movie at the first theatre had been so good that it was moved over to the other theatre so as to be able to continue the run of the picture. Whenever a "move-over" occurred Pastime charged the same admission price as was charged at the first showing theatre.

Generally speaking Pastime in its licensing agreements with the distributors at its first run theatres were granted clearances over plaintiffs', Consolidated's, and other exhibitors' theatres in the Charleston area of from twenty-eight to forty-two days for the first run pictures at its downtown theatres; and such pictures were not licensed by the distributors for exhibition at plaintiffs' and other exhibitors' theatres until after the clearance periods granted by the distributors for exhibition at plaintiffs' and other exhibitors' theatres until after the clearance periods granted by the distributors to Pastime. The record reflects that in the event the distributors violated their clearance agreement with Pastime as to these first-run pictures, the latter's president, Mr. Sottile, or its manager, Mr. Meyer, protested vigorously on such occasions to the distributors.

■■ There is no competent evidence in the record to support plaintiffs' contention that Pastime requested or received any clearance over plaintiffs' Holly Hill Drive-In Theatre for any films, nor that it demanded or received any clearance or priority for second or subsequent run pictures over any of plaintiffs' theatres. Neither is there any competent evidence to support plaintiffs' contention that Pastime was in any way responsible for the distributors' refusal to make available any of their pictures to plaintiff at his Holly Hill Theatre at earlier dates, or that it had anything to do with the delays experienced by plaintiffs in obtaining second or subsequent

run films at any of their theatres. In this connection it is noted that in her deposition and affidavit Mrs. Ayers stated that when she attempted to get earlier exhibition dates for pictures at Holly Hill some of distributors' salesmen told her that this could not be done because of Pastime's objection. There is no showing that such salesmen were authorized by the distributors to make any such statements to Mrs. Ayers. Even if such evidence were relevant and admissible against the distributors themselves, such would not be competent as to Pastime since no representative of Pastime was present when such statements were allegedly made, and plaintiffs have failed to first establish by independent and competent evidence that a conspiracy between Pastime and the distributors then existed so that any statement made by an alleged "conspirator" would be admissible against Pastime as a "co-conspirator".

■ The record supports the conclusion that there was no substantial competition between defendant Pastime's Charleston Theatres and plaintiffs' Holly Hill Drive-In Theatre. Furthermore, there is no competent evidence sufficient to form the basis for a reasonable inference that, if the Holly Hill Drive-In Theatre did not obtain film on a "day and date" basis with the theatres of defendant Pastime and former defendant Consolidated, such failure was due to or caused in any manner by a plan, scheme, design or conspiracy on the part of Pastime to discriminate against plaintiff. There is no showing that Pastime ever requested, demanded, or sought any clearance over the Holly Hill Drive-In Theatre, nor is there any competent evidence to show that it in any manner ever attempted to influence any of the distributors in their making pictures available to plaintiffs at the Holly Hill Drive-In. Neither is there any evidence that Pastime had knowledge of or sought to influence in any manner the film rentals charged to plaintiffs at their Holly Hill Drive-In Theatre, or at any other of their theatres.

Plaintiff Mrs. Ruth T. Ayers generally handled the management, supervision and operation of all of plaintiffs' drive-in theatres involved in these two actions. She also conducted negotiations and made arrangements with representatives of the distributors for the booking and exhibition of the distributors' pictures in plaintiffs' drive-in theatres. It further appears that Mr. Ayers took very little part in the management, supervision and operation of these theatres but relied almost totally upon Mrs. Ayers.

In the motion picture industry it is a common, acceptable, and reasonable practice for first class "brick and mortar" theatres, particularly in key areas such as Charleston, to be given a reasonable and first run clearance or priority in showing pictures over second class "brick and mortar" theatres and run-of-the-mill drive-in theatres, such as those of plaintiff's drive-ins. Good business management dictates such a policy on the part of distributors as well as first run exhibitors, since a conventional theatre normally operates from 1:00 p. m. through 11:00 p. m., exhibiting about five shows per day; while at the drive-in theatres especially in the summer time, the season when they are most attractive to patrons, it is hardly possible to show more than one full length feature film after dark and before a reasonable bedtime. One must also realize that only a limited amount of film is available, and the distributors are interested in making as much profit as possible while the movie is still new and at its "peak" in terms of advertising. Accordingly it is only sound judgment that a distributor prefer a first class theatre like those of

Pastime that can produce more income per day than could plaintiffs' drive-ins or any other inferior type theatres. In fact Mrs. Ayers in her deposition testimony acknowledged that Pastime's downtown theatres should have preference of clearance over plaintiffs' drive-in theatres.[2]

 Charleston is one of the oldest cities in the United States. It is primarily built on a peninsula situate at the confluence of the Cooper and Ashley Rivers, with the Cooper River located on its eastern side and the Ashley River on its western side. The older downtown section of Charleston is in the southernmost portion of the peninsula. Because of limited space for expansion and development in the downtown area, in the last half century and particularly since World War II, the metropolitan area of Charleston has grown by leaps and bounds in a northerly direction toward Summerville, South Carolina. In the north area there are located many private industries and defense installations such as the Charleston Naval Base, Mine Force Atlantic Fleet, Headquarters for the Submarine Destroyer Flotilla Six, Naval Supply Center, Naval Hospital, Atlantic Fleet Polaris Facility, Naval Weapons Station, Marine Barracks and Charleston Air Force Base. During this period many extensive residential housing developments have been built in a northerly direction for many miles. Most of the area between the Town of Summerville and Charleston has become so heavily and densely populated that it is actually difficult to determine where the city limits of Charleston begin and end. Summerville, North Charleston and

---

2. In vol. 3, pages 452-3 of Mrs. Ayers' deposition she testified as follows:
 A. I thought at Four Mile Mr. Sottile should have had one run downtown and Fifty-Two being near Four Mile it would have been well enough for them to have first run and then have it to be available for Four Mile, but not wait for North Fifty-Two, Magnolia and sometimes Flamingo.
 Q. Your complaint, as I understand from your complaint and the statement

there, your complaint is having to wait on the other drive-ins before you could show pictures?
 A. That is correct in most all cases.
 Q. You recognize that in the industry that what we refer to as brick and mortar theatres or four-wall theatres usually get first run?
 A. Usually when they are in a key city or a city as large as Charleston.

the areas in between are definitely part of the greater Charleston Metropolitan Area. Many people who actually reside in Summerville commute daily and work in the Charleston-North Charleston area. Mr. and Mrs. Ayers acknowledge that their drive-in theatres in the Charleston and Summerville areas were patronized by a substantial number of residents of the Charleston-North Charleston areas; and that they regularly advertised the pictures showing at their theatres in the Charleston News and Courtier and the Charleston Evening Post, the two daily newspapers published in Charleston. Furthermore, plaintiffs' own exhibits in opposition to Pastime's motion for summary judgment consisting of correspondence between defendant Pastime and the former defendant distributors establish fully that Pastime considered that its theatres were in substantial competition with plaintiffs' drive-in theatres in the Charleston-Summerville Area. The court must take judicial notice of the fact that the city of Charleston has excellent shopping facilities, fine restaurants, excellent entertainment, clubs, motion picture theatres, and is quite a tourist center. It has several beautiful gardens and historical points of interest. It also has several fine hospitals serving not only the lower part of South Carolina but the entire state. Therefore the conclusion is inescapable that residents living far beyond the town of Summerville and the area in which all of plaintiffs' drive-in theatres are located, with the exception of the Holly Hill Drive-In Theatre, regularly come to Charleston to shop, to visit a doctor or a hospital, to enjoy a dinner at one of the fine eating establishments located here, and to attend a first run motion picture at one of its luxurious theatres.

Not of minor significance is the fact that television came to Charleston in a big way in the early 1950s which naturally resulted in a substantial curtailment of the public's attendance of motion pictures, causing many theatres to go out of business completely and others to operate on a marginal or a greatly reduced income basis.

## ISSUES

■ In passing upon defendant's motion for summary judgment as to each of these actions the court must decide whether on the record as a whole considering the evidence most favorably to plaintiffs they have raised any issues of material fact which should be resolved by the jury.

In its consideration of the present motion, the court has studied the record including the depositions, exhibits, and affidavits on file, and has been influenced by the reasoning and principles enumerated in the *Seago* case, supra, especially in view of the similarity of the issues in the cases. Judge Larkins in *Seago* very aptly stated the cardinal legal principles which must govern the court in its consideration of Pastime's motion for summary judgment as follows:

"If the evidence construed most favorably in behalf of the plaintiff would justify or require a directed verdict against him, the Court should enter summary judgment for the de-defendants. Dulansky v. Iowa-Illinois Gas and Electric Co., 10 F.R.D. 566 (S.D.Iowa, 1950), Dewey v. Clark, 86 U.S.App.D.C. 137, 180 F.2d 766 (1950). A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. Sartor v. Arkansas National Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). The theory underlying a motion for summary judgment is substantially the same as that underlying a motion for a directed verdict. The essence of both motions is that there is no genuine issue of material fact to be resolved by the trier of facts. In accordance with the theory of a directed verdict, a court should not grant summary judgment where it could not properly direct a verdict although it might properly set aside a verdict as being against the weight of

the evidence, and summary judgment should not be granted on the ground that if a verdict were rendered for the adverse party the court would set it aside. Fuqua v. Deapo, 34 F.R.D. 111 (W.D.Ark.1964). It is important to note, however, that facts sufficient to preclude granting of summary judgment cannot be based on sheer speculation rather than the drawing of logical inferences. Fiumara v. Texaco, Inc., 204 F.Supp. 544 (E.D.Pa.1962), affirmed in 310 F.2d 737 (3rd Cir. 1962). As the Court said in the Viking Theatre case, supra, 320 F.2d 285 at 296:

'Because of the unsubstantial nature of the comparison technique employed and the equivocal results obtained by the application of that technique, we are of the opinion that it would be impermissible to allow a jury to draw the inference that the rejection of the plaintiff's bids resulted from an intent to discriminate. A jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation. Therefore, we held that the evidence was insufficient to support the claim that the distributors rejected superior bids of the plaintiff in furtherance of a common plan.'

A mere scintilla of evidence is not enough to create an issue; there must be evidence on which a jury might rely. McVay v. American Radiator & Standard S. Corporation, 1 F.R.D. 676 (D.C.Pa.1941), affirmed 119 F.2d 593 (3rd Cir. 1941). A party may not escape summary judgment on the mere hope that something will turn up at the trial." 42 F.R.D. 627, 639–640.

Plaintiff is now required, based upon personal knowledge, to set forth such facts as would be admissible in evidence and show that he is competent to testify with respect to such matters. Rule 56(e) of the Federal Rules of Civil Procedure was amended to take care of a too rigid standard on motions for summary judgment and to enable the Court, after extensive pre-trial discovery proceedings, to dispose of litigation without the necessity for a protracted trial. This is plainly set forth in the Advisory Committee's Notes with respect to the last two sentences in Rule 56(e), which constitute the amendment to that section of the rule in 1963. Those notes read, in part, as follows:

'The last two sentences are added to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matter sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation the Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are "well pleaded" and not suppositions, conclusory, or ultimate.' (citations omitted).

'The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, is incompatible with the basic purposes of the rule. See 6 Moore's Federal Practice 2069 (2d ed. 1953); 3 Barron and Holtzoff, supra, § 1234.

'It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment.' " 42 F.R.D. 627, 633–634.

In opposition to Pastime's motion and in support of their claim of conspiracy plaintiffs now assert that: (1) The evidence establishes that defendant Pastime agreed, in fact insisted, with each distributor that the latter grant clearances over plaintiffs' Summerville and Four Mile Drive-In Theatres in favor of Pastime's first run theatres in Charleston and that Pastime's second run theatres in Charleston be granted priorities over plaintiffs' theatres; (2) The facts establish that there was no substantial competition between plaintiffs' Summerville Drive-In and Four Mile Drive-In Theatres and the first run and second run theatres of Pastime in Charleston which were granted clearances and priority over plaintiffs' said theatres; and (3) The Supreme Court and other courts have clearly established that it is unreasonable to grant clearances between theatres not in substantial competition and that therefore the vertical agreements by Pastime with each distributor to impose an unreasonable clearance is sufficient evidence of conspiracy and in fact constitutes an agreement to unreasonably restrain trade tantamount to a *per se* violation of Section 1 of the Sherman Act.

If the record reveals that there is an issue of fact as to whether or not there was such substantial competition between plaintiffs' Summerville and Four Mile Drive-In Theatres and Pastime's Theatres, or if there is an issue of fact based on competent evidence that Pastime entered into an unlawful conspiracy with the former defendants, or any one else, with intent to injure plaintiffs, or which resulted in damage or harm to them, then in either of such events Pastime's motions for summary judgment must be refused. If, however, the only reasonable inference to be drawn from the record is that there was in fact substantial competition between plaintiffs' Summerville Drive-In and Four Mile Drive-In Theatres and Pastime's theatres, then the question before the court is whether such clearances as were granted by distributors to Pastime were reasonable; United States v. Paramount Pictures, Inc., 334

U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), and whether Pastime was a party to any unlawful conspiracy, as alleged by plaintiffs.

## CONCLUSIONS OF LAW

■■ There is nothing illegal *per se* about a clearance granted one theatre over another when they are in substantial competition with each other so long as such clearance is reasonable. Plaintiffs cannot establish a conspiracy by the fact that clearances were in effect in the Charleston area among theatres in substantial competition with each other. They must go further and show that such clearances were in fact unreasonable, *and* that they were used pursuant to a common plan, design, or conspiracy to discriminate against plaintiffs. *Seago, supra.*

■ The deposition testimony of plaintiffs and others, and the conclusory opinions contained in Mrs. Ayers' affidavit in opposition to Pastime's motion for summary judgment that plaintiffs' Summerville Drive-In and their Four Mile Drive-In Theatres were not in substantial competition with the theatres of defendant Pastime are not only inconsistent and contradictory with the other competent testimony in the record, but were only expressions of personal opinions totally unsupported by their recitation of any facts which would support such opinions. As was stated by the court in Naumkeag Theatres, Inc. v. New England Theatres, Inc., 345 F.2d 910, 913 (1st Cir. 1965), cert. denied 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158, "an ultimate conclusion not only unsupported by, but contradictory to the subsidiary facts cannot stand, whether reached by a jury or expressed by a witness".

■ From a consideration of the entire record and all of the circumstances found to exist, it must be concluded that the only reasonable inference which a jury could properly draw is that plaintiffs' Summerville Drive-In and its Four Mile Drive-In Theatres and all of Pastime's theatres were in substantial competition with each other.

In view of such conclusion, in order to recover in either case plaintiffs must establish that the clearances granted Pastime by distributors were in fact unreasonable and that they were granted to Pastime pursuant to a common plan, design or conspiracy between Pastime and one or more of the distributors to discriminate against plaintiffs. *Seago,* supra.

The record discloses that the clearances agreed upon and granted to Pastime by distributors range from a minimum of twenty-eight days to a maximum of forty-five days. These clearances were in harmony with the clearances in *Seago* ranging from a minimum of thirty days to a maximum of forty-five days depending upon the particular distributor, all of which were determined in that case to be reasonable and proper under the circumstances.

■■■ Considering the types of theatres involved, the investments of the parties, the types and costs of the operations and all other relevant facts and circumstances, the only reasonable inferences to be deduced therefrom is that the clearances granted Pastime by various distributors were reasonable and proper.

Even if there were a sufficient basis in the record to warrant a reasonable inference that such clearances were unreasonable when imposed against either the Summerville Drive-In Theatre and the Four Mile Drive-In Theatre of plaintiffs, still in order to defeat Pastime's motion for summary judgment plaintiffs must establish by competent evidence that a conspiracy, plan or design existed between Pastime and the former defendants, whose purpose was to hurt, injure and damage plaintiffs.

Plaintiffs have failed to produce any direct or circumstantial evidence sufficient to give rise to a reasonable inference that Pastime was in any way a party to any unlawful conspiracy with the former defendants or with any other person, firm or corporation which brought about plaintiffs' problems in its operations of the Summerville Drive-In and Four Mile Drive-In Theatres.

■■■ Neither is there any evidence in the record to establish or even intimate that the agreements between Pastime and the distributors with reference to clearances at Pastime's Theatres did not have as their sole purpose the furthering of the business interests of Pastime and the distributors, completely disassociated from any intent to hurt, injure or damage plaintiffs in the operation of their theatres. Distributors of motion picture films are not required to license their products to every exhibitor who requires or requests them. An exhibitor does not have the absolute right to compel distributors to furnish him films or to give him the privilege of exhibiting them on the basis of any specified run. The Fifth Circuit Court of Appeals in Paramount Film Distributing Corp. v. Applebaum, 217 F.2d 101, 124–125 (5th Cir. 1954), cert. denied 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284, held as follows:

"Despite the multitude of decisions against film distributors, it is still the law that ordinarily a distributor has the right to license or refuse to license his film to any exhibitor, pursuant to his own reasoning, so long as he acts independently. The antitrust laws qualify that right only to the extent that they prohibit contracts, combinations and conspiracies, with another party, which have the purpose or effect of monopolizing or restraining trade in motion picture films. * * * Any illegality consists not in the refusal of any one distributor to license an exhibitor but in his conspiring with one or more other persons to refuse such license. * * * The question here is not whether there was a duty on the part of the distributors to license their films to appellees, but whether their refusal to do so was the result of an illegal conspiracy."

As to plaintiffs' contention #1 set forth above, it is undisputed that defendant Pastime agreed with each distributor

that it grant its theatres clearances over plaintiffs' theatres, and in fact insisted upon such clearances which were in fact granted. As to plaintiffs' contention #2 above the court cannot agree that there was no substantial competition between plaintiffs' and Pastime's theatres, but to the contrary has concluded that the only reasonable inference to be drawn from the competent testimony and record before the court is that there was substantial competition between plaintiffs' and defendant Pastime's theatres, and that such clearances and priorities were fair, reasonable and proper. During the period of time involved in this litigation defendant Pastime only operated conventional first class theatres in the Charleston Area, and provisions for clearances were made in its contracts with former defendant distributors which generally varied with each distributor. For example, in most of the contracts with Columbia a clearance period of thirty days after first run was provided for; with Metro-Goldwyn-Mayer generally a clearance of twenty-eight days was granted. There is no evidence that the clearance provided for by agreement with any distributor exceeded forty-five days. Reference to plaintiffs' depositions clearly show that they recognized and accepted the fact that Pastime was entitled to clearances over their theatres and that there was nothing improper in the granting of such clearances. Apparently up to the time of the *Seago* decision plaintiffs' primary complaint was that, although Pastime was entitled to clearances, such clearances granted by distributors to Pastime were unreasonable and that there was too much delay in the availability of pictures for plaintiffs' theatres. There is no competent evidence to substantiate plaintiffs' contention that such clearances granted to Pastime by distributors were improper or unreasonable. To the contrary all of the evidence points overwhelmingly to the conclusion that such clearances were reasonable.

As hereinabove stated the record substantiates the fact that there was no substantial competition between plaintiffs' Holly Hill Drive-In Theatre and Pastime's theatres in Charleston which were approximately fifty-seven miles apart. Therefore, there should have been no clearance between this theatre and those of Pastime. United States v. Paramount Pictures, Inc., 334 U.S. 131, at pages 145-146, 68 S.Ct. 915, at page 923. Therefore, if there were any competent evidence that the availability of distributors' pictures to plaintiffs' Holly Hill Drive-In Theatre was held back after Pastime's theatres in Charleston with which it was not in substantial competition, as a result of any agreement express or implied between Pastime and any or all of the distributors, then such would constitute sufficient evidence of conspiracy to make an issue for jury determination and defendant's motion for summary judgment should be denied.

■■■ Pastime has vehemently denied that it had anything whatever to do with the holding back of the Holly Hill Drive-In's availability of motion pictures by distributors. Mrs. Ayers' deposition and affidavit constitute the only evidence in the record tending to establish that the Holly Hill Drive-In Theatre was not allowed to show pictures of the distributors until after their exhibitions at Pastime's Charleston theatres. Such evidence of Mrs. Ayers is based upon certain alleged statements made by specified representatives of the distributors explaining in response to her requests for an earlier availability for the Holly Hill Drive-In Theatre that they had to hold back such availability because of Pastime's theatres in Charleston. As before stated such evidence is not competent as to Pastime since none of its representatives were present when such alleged statements were reported to have been made, and there is no competent evidence to warrant a reasonable inference that a conspiracy existed between Pastime and any of the distributors at the time such statements were reportedly made by the latter's sales representatives to Mrs. Ayers. Thus the court concludes that there is no competent direct or circumstantial evidence of a conspiracy between defendant Pastime

and any of the former defendant distributors in connection with plaintiffs' Holly Hill Drive-In Theatre sufficient to give rise to any jury issue in connection with plaintiffs' contentions and reference thereto.

■ After the decision in *Seago* and in an apparent attempt to distinguish that case from these cases, plaintiffs in their brief assert:

"Plaintiffs' claim in Ayers rely heavily on the absence of substantial competition * * * In the Ayers cases, plaintiffs are not urging that Pastime should have had even one first run picture taken away from it. Plaintiffs in Ayers were perfectly content that Pastime play whatever first run pictures they did, but plaintiffs are saying that because of the absence of substantial competition their theatres should have had the opportunity to play the same pictures on a territorial release or open booking availability without any restrictions in favor of the Pastime theatres (and Consolidated theatres) with which plaintiffs' theatres were not in substantial competition."

Having concluded that the only reasonable inference to be drawn from the evidence is that plaintiffs' Summerville Drive-In Theatre and Four Mile Drive-In Theatre were in fact in substantial competition with Pastime's theatres, Pastime was entitled under the circumstances to reasonable clearances from distributors over plaintiffs' said theatres, and consequently plaintiffs were not entitled to receive a territorial release or open booking availability without any restrictions in favor of Pastime's theatres.

■ Plaintiffs also allege that the fact that the former defendant distributors granted move-over runs to Pastime is evidence of an illegal conspiracy. Such claim is made without any evidentiary support that such move-over runs as were granted Pastime were made with the intent and for the purpose of discriminating against plaintiffs in any manner. The evidence is uncontradicted that Pastime charged the same admission price for the films when it was granted move-over privileges. The law is clear that there is nothing unlawful or improper in the granting of move-over runs if the motion picture is moved from one theatre to another as a continuation of the first run, and the same admission price is charged at the move-over theatre. Robinsdale Amusement Corp. v. Warner Bros. Picture Distributing Corporation, 141 F. Supp. 134 (D.Minn.1955), affirmed 235 F.2d 782 (8th Cir. 1956).

Plaintiffs further allege as evidence of an illegal conspiracy that the former defendant distributors discriminated against plaintiffs in favor of defendant Pastime in the film rentals which they charged plaintiffs. They also assert that distributors granted Pastime rental adjustments which were not afforded plaintiffs. Proof of such contentions is offered in certain tabulated charts attached as exhibits to the second affidavit of Mrs. Ayers in opposition to defendant's motion for summary judgment. The apparent purpose of such charts is to show that in connection with certain motion pictures plaintiffs paid more percentagewise for film rentals than did Pastime. A study of such charts substantiates that in some instances this was true. However, generally plaintiffs paid substantially less rental than did Pastime.[3] The court cannot accept these facts as any evidence of an illegal conspiracy against plaintiffs

3. The affidavit of Wilbert Stevens Fox, a CPA employed by Pastime which was filed February 23, 1968 contains an analysis and comparison of the gross receipts shown on Exhibits "A" and "B" of Mrs. Ayers' second affidavit between the theatres operated by Pastime and the theatres operated by plaintiffs. His analysis is as follows: Exhibit "A" shows that out of the total fifty-six pictures for which gross receipts are listed which were shown at plaintiffs' theatres the total film rental paid to Distributors was $2,251.79 which represented 29.24 percent of their gross receipts; whereas out of the total fifty-two pictures for which gross receipts are listed which were shown at Pastime's theatres a total rental of $62,919.16 was paid which represented 38.68 percent of Pastime's gross receipts

participated in by Pastime. The record reflects that plaintiffs' negotiations with distributors in connection with film rentals and film rental adjustments, if any, were conducted solely between them and the distributors with Pastime having no interest, control, participation in, or influence over such rentals. Whatever rentals were agreed upon by plaintiffs and distributors were their own voluntary acts. The Third Circuit Court of Appeals in Viking Theatre Corp. v. Paramount Film Distributing Corp., 320 F.2d 285 (3d Cir. 1963), which was affirmed by the United States Supreme Court, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964), held that the evidence failed to present a jury question as to whether defendant distributors and defendant exhibitors were guilty of discriminatory conduct from which it could be inferred that a conspiracy existed in connection with film rentals or film rental adjustments. The court stated:

### "FILM RENTALS

"It is charged that in furtherance of the conspiracy, the defendant distributors 'required' the plaintiff to pay 'excessive' film rentals. The term 'excessive' implies an amount too great to be fair and reasonable. To support the charge, the plaintiff attempted a comparison of the film rental it paid with that paid by the defendant exhibitors. * * *

"We have some difficulty in determining what inference could be drawn from either the evidence in the record or that offered by the plaintiff. The calculations are based upon a hindsight determination of the earning power of films exhibited, while licensing takes place before earning power, as reflected by gross receipts, can be determined. Therefore, the figures do not tend to reflect the rental terms which the parties to the license might foresee as being fair and reasonable. Moreover, the calculations provide no criteria determinative of 'excessiveness.'

"We entertain serious doubt as to the probative value of the comparisons. The plaintiff's computation of gross film rental paid by it includes the total of six guarantees, each of which was considerably higher than the earned film rental. The reference is to the guarantees paid on pictures licensed by Viking in the second year of its operations. Absent these guarantees, the comparisons are of little or no significance.

"Whatever the comparisons are intended to show, there is no evidence from which it can be inferred that the plaintiff was 'required' to offer excessive rental terms. There is likewise no evidence which would warrant a conclusion that the plaintiff was under any compulsion to offer guarantees which later proved to be excessive. The record is devoid of proof from which it can be inferred that any distributor was aware that the film rentals offered were deemed by the plaintiff to be unreasonable. The rental terms were voluntarily proposed by the plaintiff; the acceptance of those terms by the distributors would not permit an inference that plaintiff was required to offer them.

"The above deficiencies in the evidence aside, there is no proof, direct or circumstantial, that there was a common understanding among distributors with respect to film rentals. There is no evidence from which it can be inferred that any distributor had knowledge of the film rentals charged by any other distributor. There is nothing in the evidence as a whole from which a jury could reasonably conclude that the

from such pictures. Exhibit "B" shows that out of the total of 109 pictures for which gross receipts are listed which were shown at plaintiffs' theatres a total film rental paid to Distributors by plaintiffs was $4,529.70 which represents 27.-47 percent of their gross receipts; whereas out of a total of 106 pictures for which gross receipts are listed which were displayed at Pastime's theatres it paid a total film rental to Distributors of $70,948.18 which represents 31.01 percent of its gross receipts for said pictures.

distributors conspired to exact excessive film rentals from the plaintiff." 320 F.2d 285, 298–299.

The factual situation in *Viking* appears quite analogous to the situation here. There is no intimation that plaintiffs were pressured in any manner to pay higher prices for their film rentals. Neither is there any indication that plaintiffs ever protested to distributors as to any "excessive" rentals charged them; nor that plaintiffs sought from the distributors any adjustments in the rentals they were charged. On the other hand Pastime's management repeatedly demanded rental adjustments from the distributors, some of which were granted. Even if the record contained sufficient evidence, which it does not, to support a finding that there was a "parallel conspiracy" between distributors to charge plaintiffs excessive rentals and their failure to grant proper film rental adjustments, there is not a scintilla of evidence that Pastime, a competitive exhibitor, knew, participated in, or had any connection with any of the distributors' film rental charges to plaintiffs.

Plaintiffs further assert that their drive-in theatres were held back after the theatres in Charleston with which they were alleged not to be in substantial competition gives rise to an inference of a so-called "vertical conspiracy". Since the court has concluded that the only reasonable inference to be deducted from the evidence is that plaintiffs' theatres were in substantial competition with the theatres of Pastime and former defendant Consolidated, such theatres were entitled to a reasonable clearance over plaintiffs' theatres. Up to the point in this litigation when Consolidated was dismissed as a party defendant plaintiffs apparently never seriously urged that the clearances granted Pastime ranging from twenty-eight to forty-five days were unreasonable or excessive. Their primary complaint appears to have been that the distributors were favoring Consolidated's drive-in theatres by requiring plaintiffs to wait until after pictures had had their runs in Consolidated's theatres before they were made available to plaintiffs. Surely Pastime should not be held responsible for any delays in plaintiffs' availability to films beyond the clearances provided for in its contracts with distributors, when there is no evidence that it ever sought or received more from the distributors. Actually plaintiffs seek to invoke the doctrine known as "conscious parallel action" by contending that an unlawful conspiracy should be inferred from the fact that the distributors did not make film available to them until after Pastime's and Consolidated's theatres had had their runs. The record substantiates that plaintiffs' delay in receiving films for exhibition until after they were shown in Pastime's downtown theatres and Consolidated's drive-in theatres resulted in sound business judgment, and such circumstances standing alone without any other evidence of conspiracy between distributors and exhibitors Pastime and Consolidated are not sufficient to infer a conspiracy based on parallel action. In Brown v. Western Massachusetts Theatres, Inc., 288 F.2d 302 (1st Cir. 1961), the court held that the evidence, including that of parallel action by motion picture distributors, was insufficient to take to the jury the question whether distributors and others, who did not engage in competitive bidding, had conspired to monopolize and restrain trade in pictures in areas of plaintiff's theatres. In that case the court stated: "Plaintiff makes the customary attempt to rely on the theory of consciously parallel action. But, as the Supreme Court has said, ' "[C]onscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.' Theatre Enterprises, Inc., v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 541, 74 S.Ct. 257, 260, 98 L.Ed. 273. And in any event, something more than occasional similarity of conduct is required." Our own Fourth Circuit in Windsor Theatre Co. v. Walbrook Amusement Co., 189 F.2d 797 (4th Cir. 1951) had occasion to pass upon the sufficiency of evidence allegedly in support of a so-called "horizontal con-

792

spiracy". At pages 798 and 799 the court stated:

"A careful examination of the record fails to show any horizontal conspiracy among the distributors in selling to the larger and longer-established Walbrook Theatre in preference to the newly-established Windsor Theatre. It seems to this court quite natural that the distributors would not be prone to substitute an unknown customer for a proven one. This Court cannot see how the preference of one exhibitor over another is, per se, a combination in restraint of trade. Indeed, every 'exclusive' contract has that effect. As the District Court concluded: 'There is no evidence tending to show any conspiracy or concerted action by distributors; that is, there is no "horizontal" conspiracy in these cases. To some extent it may be said that some of the distributors have much of the time acted similarly with respect to Rosen and Goldberg; but similarity of action under substantially like circumstances affecting each distributor is not proof of conspiracy.' "

Another significant circumstance in this case is the almost total failure of Mrs. Ayers, who concededly was in complete charge of managing and operating plaintiffs' theatres including the securing of pictures for them, to take positive and affirmative action to obtain films earlier from proper representatives of the distributors. The evidence reveals that she merely wrote two letters, one to Loew's and another to Universal in an attempt to secure pictures for the Summerville Drive-In. The only other evidence of any activity on her part in this connection was her statement that on several occasions she discussed the matter with the distributors' salesmen who advised her that nothing could be done about it. She was apparently content to accept their statements and do no more about this matter. In the case of Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 268 F.2d 246, 251, (2d Cir. 1959), cert. den'd 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959),

which involved a similar factual situation, the Court of Appeals for the Second Circuit held:

"Finally appellant complains that its failure to make a demand to the distributors should not be considered fatal to its claim. It presents two reasons for this position: (1) the making of demands would not have had any effect * * *. As we have previously held and recently reiterated: '[P]laintiffs cannot recover damages on account of any failure to obtain feature pictures for first-run exhibition unless they made demand for that of which they now claim they were deprived by the conspiracy.' "

See also Hamilton Street Corporation v. Columbia Pictures Corporation, et al., 244 F.Supp. 193 (E.D.Pa.1965), where the court granted summary judgment for defendant distributors on the basis that the record did not fulfill the requirements of affirmative evidence of clear request or demand by theatre operators for availability of films, and that plaintiffs could not recover in absence of such a demand.

During the extended period of this litigation the parties have made full use of the discovery procedures granted under the Federal Rules. Depositions of most available witnesses have been taken, and countless exhibits and affidavits have been filed. Nevertheless, plaintiffs have failed in their efforts to make out a *prima facie* case against Pastime. Applying the guidelines established by Amended Rule 56 of the Federal Rules of Civil Procedure, it is concluded that plaintiffs have failed to raise a genuine issue of material fact sufficient to defeat Pastime's motion for summary judgment. The evidence construed most favorably in behalf of plaintiffs would require a directed verdict against them, and accordingly the Court should enter summary judgment for defendant in each action. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Dulansky v. Iowa-Illinois Gas & Electric Co., 10 F.R.D. 566 (S.D. Iowa 1950). Dewey v. Clark, 86 U.S.

App.D.C. 137, 180 F.2d 766 (1950). A jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation. A mere scintilla of evidence is not enough to create an issue. There must be evidence upon which a jury may reasonably rely; and a party may not escape summary judgment on the mere hope that something will turn up at the trial. The plaintiffs have not offered sufficient evidence, either direct or circumstantial, of a common plan, scheme, design or conspiracy among Pastime and any of the former defendants to these actions; neither have plaintiffs raised any issue of material fact as to the lack of substantial competition between its Charleston and Summerville area drive-in theatres and those of Pastime. Nor has it raised a sufficient issue as to the reasonableness and propriety of the clearances granted Pastime by distributors; nor that such clearances were used pursuant to any common plan, scheme, design or conspiracy to discriminate against plaintiffs. It is, therefore,

Ordered that Pastime's motion for summary judgment in each case be, and the same hereby is, granted.