**UNIVERSAL AMUSEMENTS CO., INC.,**
**et al., Plaintiffs,**

v.

**GENERAL CINEMA CORP. OF**
**TEXAS, INC., et al.,**
**Defendants.**

**Civ. A. No. H–78–192.**

United States District Court,
S.D. Texas,
Houston Division.

Nov. 22, 1985.

Marion S. Rosen, Marion S. Rosen & Assoc., Ben H. Schleider and Paul S. Francis, Schleider & Francis, Houston, Tex., for plaintiffs.

Rufus Wallingford, Fulbright & Jaworski, Houston, Tex., for exhibitor defendants.

Ralph S. Carrigan and J. Michael Baldwin, Baker & Botts, Houston, Tex., for distributor defendants.

Stephen D. Susman and Terrell W. Oxford, Susman, Godfrey & McGowan, Houston, Tex.; A. Vernon Carnahan, Donovan, Leisure, Newton & Irvine, New York City, and Paul E. Stallings, Vinson & Elkins, Houston, Tex., for all other defendants.

## MEMORANDUM OPINION

SINGLETON, Chief Judge.

### I. BACKGROUND

#### A. The Lawsuit

The Plaintiffs [1] owned and operated the Champions Village Cinema, located northwest of downtown Houston at 6550 FM 1960 W., from its opening in September 1973 until its sale to American Multi-Cinema in April 1980. During that same time period each exhibitor defendant [2] owned theaters in the Houston area which, like Champions, catered to the general public. The distributor defendants [3] meanwhile distributed the bulk of the films these theaters played.

The distributor defendants licensed their high quality first-run films to Houston exhibitors primarily through a process of competitive negotiations and bids.[4] They accordingly informed Champions that to continually get such first-run films, Champions would have to bid against the other exhibitors in the Houston Exchange. Champions, however, generally refused to so bid—contending that it did not compete with the Houston exhibitors and thus, like the outlying Sugarland and Baytown theaters, should be allowed to negotiate first-run films independent of the Houston exhibitors' bids. Since the distributor defendants refused to treat Champions as such an outlying theater, Champions settled for playing less profitable near-run and sub-run films.

Plaintiffs claimed that the distributor defendants' requiring Champions to bid in the Houston Exchange stemmed from a conspiracy or series of conspiracies amongst various exhibitors and distributors. As distilled and focused at trial by Plaintiffs' damage/causation expert,[5] Plaintiffs claimed that the conspiracy's including Champions in the Houston Exchange in turn subjected Champions to the following anticompetitive practices: (1) the other exhibitors' depriving Champions of licenses by successfully allocating films amongst themselves (the split); (2) General Cinema's inducing the distributors to deny Champions a license on films awarded the Greenspoint Theatre (the clearances); (3) the distributors' limiting the number of film prints available to exhibitors in the Houston Exchange (the print limits); and (4) the distributors and exhibitors constantly abusing the hybrid bid/negotiation process for awarding film licenses (the licensing abuse). Invoking various antitrust theories such as boycott and monopolization, Plaintiffs concluded that the defendants' conduct violated Sections 1 and 2 of the Sherman Act.

Citing pendant state law grounds, Plaintiffs alternatively claimed that the defendants tortiously interfered with valuable business or contractual relationships existing between Plaintiffs and others.

Finally, Plaintiffs alleged that they incurred damages of approximately $1.5 million from the defendants' illegal conduct.

#### B. Procedural Posture

The trial of this case before a jury began on 4 September 1985. Plaintiffs rested on October 2, and the defendants moved for a directed verdict pursuant to Fed.R.Civ.P. 50(a). After studying the filed briefs and hearing the parties' oral arguments, this Court on October 3 granted a directed verdict in favor of each defendant. This Memorandum Opinion explains that decision.

### II. DIRECTED VERDICT STANDARD

*Boeing v. Shipman* established the standard for assessing directed verdict motions in this Circuit:

On motions for directed verdict ... the Court should consider all of the evidence—not just that evidence which sup-

---

1. The plaintiffs are Universal Amusement Co., Inc. and its wholly owned subsidiary, Entertainment Projects, Inc. ("Plaintiffs").

2. The exhibitor defendants are: General Cinema Corp. of Texas; A.B.C. Interstate Theatres, Inc.; and an affiliate of Loews Corp.

3. The distributor defendants are: Paramount Pictures, Corp.; Twentieth Century Fox Film, Corp.; Warner Brothers Distribution Corp.; Columbia Pictures Industries, Inc.; United Artists Corp./Metro-Goldwyn-Mayer (MGM); and Buena Vista Distribution Co.

4. United Artists, however, did not begin licensing by competitive bidding until 1977.

5. Dr. James Smith.

ports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict ... should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc); *accord e.g. J.T. Gibbons Inc. v. Crawford Fitting*, 704 F.2d 787, 790–91 (5th Cir.1983) (affirming directed verdict against antitrust plaintiff); *Shumate & Co. v. National Assn. of Securities Dealers*, 509 F.2d 147, 153 (5th Cir.) *cert. denied* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

With that standard in mind, this Court explains its disposal of Plaintiffs' antitrust and tortious interference claims.

**6.** Although § 1 claims implicating the Per Se Rule may not require proof of a relative market, Plaintiffs' case did not warrant per se treatment. *See infra* text § III C.2.

**7.** Section 2 conspiracy to monopolize claims might not require proof of a relevant market. *Gibbons*, 704 F.2d at 797; *but see Sulmeyer v. Coca Cola*, 515 F.2d 835, 851 (5th Cir.1975) *cert.*

### III. ANTITRUST CLAIMS

#### A. Relevant Market

 To prevail on any of their antitrust claims, Plaintiffs had to establish a relevant product and geographic market. *E.g., Hornsby Oil v. Champion Spark Plugs*, 714 F.2d 1384, 1390–94 & n. 8 (5th Cir.1983) (defined relevant market necessary to assess § 1 unreasonable restraint of trade);[6] *Domed Stadium Hotel v. Holiday Inns*, 732 F.2d 480, 487, 490 (5th Cir. 1984) (defined relevant market necessary to assess § 2 actual or attempted monopolization).[7] The same basic principles, moreover, govern a relevant market's definition under Sections 1 and 2. *Hornsby Oil*, 714 F.2d at 1393 n. 9.

This case's relevant product market consisted of high quality first-run films. *See e.g.*, Transcript of 29 August 1985 pre-trial conference, page 33, lines 3–5; page 38, lines 1–3.

As for the geographic aspect, Plaintiffs had confined their complaint to the film distribution market—i.e., the licensing of films from distributors to exhibitors. *Id.* at page 37, lines 20–24. The relevant geographic market therefore encompassed the geographic area in which the distributors effectively competed for licensees of their high quality first-run films. *E.g., Hornsby Oil*, 714 F.2d at 1393; *see also Tampa Electric v. Nashville Coal*, 365 U.S. 320, 330–33, 81 S.Ct. 623, 629–31, 5 L.Ed.2d 580 (1961).

 Plaintiffs bore the burden of producing competent economic evidence for the jury to assess the scope of that geographic market. *See e.g. U.S. v. Connecticut National Bank*, 418 U.S. 656, 669–70, 94 S.Ct. 2788, 2796–97, 41 L.Ed.2d 1016 (1974) (geographic market in Clayton Act

*denied* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976). Plaintiffs nonetheless failed to evidence other elements of those claims such as the conspiracy's existence and the member's specific intent to monopolize. *Compare Gibbons*, 704 F.2d at 796 (§ 2 conspiracy to monopolize elements) *with infra* text § III.B.2 (no specific intent evidenced) and § III.C.1 (no conspiracy evidenced).

§ 7 claim); *Joseph Ciccone & Sons v. Eastern Industries,* 559 F.Supp. 671, 674–77 (E.D.Pa.1983) (same). Although they produced some sparse evidence as to Champions' competition in the *exhibition* market for theater patrons, Plaintiffs produced no competent economic evidence concerning the geographic scope of the distributors' competition in the *distribution* market for film licensees. Thus despite Plaintiffs' frequent allusions to the "Houston market", the jury had no substantial evidence upon which to determine the relevant geographic market in this case. That failure in Plaintiffs' proof alone warranted a directed verdict on the antitrust claims.

## B. § 2 Claims

Even if Plaintiffs had adduced sufficient evidence of a relevant geographic market, their § 2 claims could not survive a directed verdict motion.

### 1. Actual Monopolization

■ A distributor defendant—or group of them [8]—could conceivably have driven Champions out of business to monopolize the distribution market.[9] A § 2 monopolization claim requires proof that the guilty distributor defendant

(1) possessed monopoly power in the relevant distribution market; and

(2) willfully acquired or maintained that power as distinguished from the power's resulting from a superior product, business acumen, or historical accident.

*E.g., U.S. v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *accord Domed Stadium,* 732 F.2d at 480. "Monopoly power", moreover, is the power to control prices or exclude competition. *E.g., U.S. v. E.I. duPont de Nemours,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); *Domed Stadium,* 732 F.2d at 487.

■ Yet Plaintiffs failed to substantiate that any defendant possessed monopoly power in any geographic market. The record similarly lacked substantial evidence as to the willful acquisition or maintenance of any monopoly power. Those failures mandated directing the verdict on Plaintiffs' § 2 claim concerning monopolization of the distribution market.[10]

### 2. Attempted Monopolization

■ Alternatively, some distributor defendants could have driven Champions out of business in an unsuccessful *attempt* to monopolize the distribution market.[11] Such a § 2 attempt claim would require proof of

(1) the guilty defendants' specific intent to bring about a monopoly; and

(2) a dangerous probability of success as to monopolizing some relevant distribution market.

*E.g., Domed Stadium,* 732 F.2d at 490; *Aviation Specialties v. United Technologies,* 568 F.2d 1186, 1192 (5th Cir.1978). The record lacking substantial evidence of those elements, this Court had to direct the verdict on Plaintiffs' § 2 claims concerning attempt to monopolize the distribution market.[12] *See e.g. Aviation Specialties,* 568 F.2d at 1192–93.

---

**8.** A group of defendants can jointly violate § 2. *U.S. v. American Airlines,* 743 F.2d 1114, 1116–18 (5th Cir.1984).

**9.** For example, a distributor defendant could drive competing distributors out of business—and thereby monopolize the distribution market—by destroying exhibitors such as Champions which provided essential licensing income to the distributor defendant's competitors. Given the record's failure to advance any such scenario, however, the jury would have had to engage in impermissible speculation to find for the Plaintiffs on such a § 2 theory. That flaw alone justified directing the verdict.

**10.** Even if this Court ignored Plaintiffs' having limited their case to the distribution market, this same rationale would necessitate directing the verdict as to any claim of monopolizing the exhibition market.

**11.** Directing the verdict was also proper on the ground that Plaintiffs' evidence did not advance such a scenario. *See supra* n. 9.

**12.** This same rationale would require directing the verdict even if this Court expanded Plaintiffs' case to include the exhibition market.

### C. § 1 Claims

The two fundamental components of a § 1 claim are (1) a conspiracy which (2) unreasonably restrains trade. Plaintiffs, however, failed to raise a jury question as to either of those issues.

### 1. Conspiracy

Plaintiffs' § 1 claim rested upon a comprehensive distributor-involved [13] conspiracy to restrict Champions' access to high quality first-run films.[14] Plaintiffs accordingly bore the burden of proving facts from which the jury could reasonably infer such a conspiracy. *Paramount Film Distributing v. Applebaum*, 217 F.2d 101, 126 (5th Cir.1954), *cert. denied* 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284 (1955). To preclude a directed verdict, Plaintiffs' conspiracy evidence had to "attain the dignity of substantial evidence" rather than merely "create suspicion" or require the jury "to resort to speculation." *Admiral Theatre v. Douglas Theatre*, 585 F.2d 877, 883–84 (8th Cir.1978); *accord Boeing*, 411 F.2d at 374–75.

Plaintiffs' attempt to establish the conspiracy circumstantially by illustrating the distributor defendants' mistreating Champions and unfairly favoring the exhibitor defendants, however, entailed evidence inherently susceptible to speculation and suspicion. For example, a distributor's unfairly rejecting Champions' demand to negotiate outside the Houston Exchange means little in itself since no exhibitor has an absolute right to demand a license and all distributors have very broad discretion in awarding their films. *Applebaum*, 217 F.2d at 124. A distributor acting independently has no legal duty to offer equally suitable theaters an equal opportunity to negotiate for or obtain films. *Id.* at 124–25. Nor must it assess bids consistently or

13. Although Plaintiffs advanced two theories which could have involved only exhibitors, neither theory provided Plaintiffs a cause of action.

First, the alleged agreement to split/allocate films could have included only exhibitors. But a split agreement between the exhibitors could not have inflicted any antitrust injury upon Champions unless some distributors cooperated by licensing only to the split's members. *Southway Theatres v. Georgia Theatre*, 672 F.2d 485, 492 (5th Cir.1982); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 20 (9th Cir.1971). Indeed, without such distributor involvement the split would have lessened bidding competition and thereby made it easier for non-splitting exhibitors such as Champions to obtain films. *Id.* Since Plaintiffs lacked standing to attack conduct not shown to a reasonable certainty to have injured them, 15 U.S.C. §§ 15, 26; *see also e.g. E.A. McQuade Tours v. Consolidated Air Tour Manual Cmte.*, 467 F.2d 178, 183 (5th Cir.1972) *cert. denied* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Admiral Theatre v. Douglas Theatre*, 585 F.2d 877, 893 (8th Cir.1978), a split without distributor involvement could not provide these Plaintiffs a cause of action. *See Southway Theatres*, 672 F.2d at 492.

Second, Plaintiffs' Complaint suggested that the exhibitor defendants' conspiracy had violated the consent decree in *U.S. v. Paramount*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Although Plaintiffs apparently dropped that contention at trial, this Court noted that such a violation could not provide Plaintiffs a cause of action since only the government can seek enforcement of its consent decrees. *E.g., Dahl*, 448 F.2d at 20.

Accordingly unable to maintain either of their conspiracy claims based upon exhibitor conduct alone, Plaintiffs had to produce substantial evidence concerning one of their potential distributor-involved conspiracies.

14. Although Plaintiffs advanced no well-defined conspiracy theory at trial, a very generous construction of the record suggested three types of distributor-involved antitrust conspiracies: (1) a distributor-instigated conspiracy with exhibitors to restrain trade in the film distribution market with territorial-type restrictions, (2) a distributor-instigated conspiracy with other distributors to concertedly refuse to deal with Champions, and (3) an exhibitor-instigated conspiracy with distributors to boycott Champions. Since the conspiracy's economics and members' motives would differ in each situation, one could assess the inferential probativeness of Plaintiffs' evidence under a slightly different light depending upon which particular conspiracy's existence and membership was in issue. Although this Court gave Plaintiffs' evidence the benefit of all favorable inferences reasonably available under any of those three conspiracy theories, the conspiracy evidence's meagerness and character makes such subtle distinctions unnecessary in explaining this Court's conspiracy conclusion. Accordingly, just as the parties did in their directed verdict arguments, this Memorandum Opinion discusses the conspiracy evidence in terms of the alleged comprehensive conspiracy to restrict Champions' access to high quality first-run films.

in good faith. *See Lamb's Patio Theatre v. Universal Film Exchanges,* 582 F.2d 1068, 1069–70 (7th Cir.1978). Thus a distributor defendant acting independently could, legally, have favored an exhibitor defendant over Champions for any reason or no reason at all. *Id.* at 1070; *see also U.S. v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Monsanto Co. v. Spray-Rite Service,* 465 U.S. 752, 761–63, 104 S.Ct. 1464, 1469–70, 79 L.Ed.2d 775, 783–84 (1984); *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 425–26 (5th Cir.1985); *St. Bernard General Hospital v. Hospital Service Assn.,* 712 F.2d 978, 986–87 (5th Cir.1983) *cert. denied* 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984); *Mendelovitz v. Adolph Coors Co.,* 693 F.2d 570, 575 n. 9 (5th Cir.1982); *Aviation Specialties,* 568 F.2d at 1192; *Admiral Theatre,* 585 F.2d at 888; *Syufy Enterprizes v. National General Theatres,* 575 F.2d 233, 236 (9th Cir.) *cert. denied* 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir.1971).

Given that sweeping discretion, a defendant's conduct as member of a conspiracy often would not differ from its conduct absent a conspiracy. *See Southway Theatres v. Georgia Theatre,* 672 F.2d 485, 502 (5th Cir.1982) (Appendix: Dist.Ct. opinion). This Court accordingly bore that evidentiary dilemma in mind when culling the record for reasonable—as opposed to speculative—inferences of the alleged conspiracy.

*(a) The conditionally admitted hearsay*

█ Plaintiffs attempted in part to satisfy their burden of proof with hearsay statements made by alleged co-conspirators concerning defendants such as United Artists, Columbia, and Fox. This Court conditionally admitted those statements into evidence subject to Plaintiffs' later connecting them up to the conspiracy. After Plaintiffs rested this Court had to determine as a factual matter whether Plaintiffs had shown by a preponderance of the evidence independent of the hearsay itself

(1) that the conspiracy existed,

(2) that the co-conspirator and defendant against whom that co-conspirator's

statement was offered were both members of the conspiracy, and

(3) that the co-conspirator made the statement in the course and furtherance of the conspiracy.

*U.S. v. James,* 590 F.2d 575, 582–83 (5th Cir.) (en banc) *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *Park v. El Paso Bd. of Realitors,* 764 F.2d 1053, 1064–65 (5th Cir.1985) (antitrust case). At minimum, Plaintiffs failed to establish a conspiracy's existence and membership by such a preponderance. *See infra* text § III.C.1(b)–(g) (Plaintiffs' independent evidence not substantial). Since those hearsay statements accordingly could not remain in evidence, *James,* 590 F.2d at 582–83; *Park,* 764 F.2d at 1064–65, they could not help satisfy Plaintiffs' burden of adducing substantial evidence of the conspiracy.

*(b) Distributors' parallel conduct*

The distributors engaged in parallel business behavior such as almost uniformly requiring Champions to bid in the Houston Exchange. The Fifth Circuit has recently cautioned, however, that

one can infer accord from common action only if it occurs in a setting which bespeaks accord.... The fact that all people eat, drink, are occasionally merry, and die is hardly evidence of a conspiracy. In order to present a jury question regarding the existence of a conspiracy, an antitrust plaintiff must establish not merely consciously parallel action but a "plus factor" that indicates agreement.

*Park,* 764 F.2d at 1060 n. 11 (citing L. Sullivan, *Antitrust* 315, 317 (1977)); *see also Southway Theatres,* 672 F.2d at 494 n. 10.

█ The "consciousness" requirement demands more than the distributors' mere mutual awareness of similar conduct. *Brown v. Western Massachusetts Theatres,* 288 F.2d 302, 305–06 (1st Cir.1961) (denying petition for rehearing). The mutual awareness must have entered into each distributor's decisional process, and the basis for inferring that it did so must be something more substantial than a guess. *Id.* Although one might guess that the distributors' parallel conduct here

was so "conscious", Plaintiffs failed to adduce evidence substantial enough to support a nonspeculative jury finding that such consciousness actually existed.

■ As for the necessary "plus factor", courts commonly hold that parallel behavior bespeaks accord only when it is so inconsistent with the individual actor's economic self-interest that the behavior falls short of good faith business judgment. *E.g., Aviation Specialties,* 568 F.2d at 1192; *Admiral Theatre,* 585 F.2d at 884, 886; *cf. Southway Theatres,* 672 F.2d at 493–96, 501–04; *but see Park,* 764 F.2d at 1060 n. 11. The distributors' parallel conduct accordingly would not support a conspiracy inference if that conduct was as consistent with the distributors' rationally exercising their broad licensing discretion as with their participating in a planned conspiracy to restrict Champions' access to high quality first-run films. *Brown,* 288 F.2d at 805; *cf. Syufy,* 575 F.2d at 236; *Dahl,* 448 F.2d at 19–20 & n. 1; *Admiral Theatre,* 585 F.2d 884. Plaintiffs failed that "against self-interest" test since the record contained no substantial evidence that parallel behavior such as requiring Champions to bid the Houston Exchange contradicted individual distributor's economic self-interest.

Despite that failure, this Court would have considered the "plus factor" requirement satisfied if Plaintiffs' other conspiracy evidence substantiated a setting in which the distributors' common action bespoke accord. *See Park,* 764 F.2d at 1060–61 & n. 11. But given the gross insufficiency of that other evidence, *see infra* text § III.C.1(c)–(f), this Court concluded that Plaintiffs substantiated no such setting.

Plaintiffs having failed to sufficiently evidence the "consciousness" and "plus

factor" requirements, parallel conduct such as requiring Champions to bid in the Houston Exchange could not support an inference of conspiracy.

### (c) Distributors' rejecting Champions' "superior" bids

Plaintiffs' bid analysis and playoff summaries purportedly showed the distributors' systematically rejecting Champions' superior bids in favor of the exhibitor defendants' inferior bids.[15] Such a clear and consistent pattern of distributors' rejecting a particular theater's bids when accepting those bids would have been more profitable could well evidence a conspiracy. *See Southway Theatres,* 672 F.2d at 502; *Admiral Theatre,* 585 F.2d at 885. Yet the competitive bidding process not always being competitive or the distributors not considering all offers equally is not legally significant standing alone. *Brown,* 288 F.2d at 304. Indeed, given the broad licensing discretion afforded distributors,[16] Plaintiffs had to show that Champions' rejected offers were so lucrative that their rejection could be explained only as a series of extraordinarily bad business judgments or as the rejecting distributors' participation in a conspiracy to restrict Champions' access to high quality first-run films.[17] *Southway Theatres,* 672 F.2d at 501; *see also Dahl,* 448 F.2d at 19–20 & n. 1. Plaintiffs' summaries could therefore divert a directed verdict as to a particular distributor only if they substantiated (1) a systematic pattern by that distributor of rejecting (2) clearly superior offers made by Champions.

■ Plaintiffs, however, failed to evidence a systematic pattern. For example, their evidentiary summary spanning March

---

**15.** Those summaries were prepared by a party standing to gain approximately 30% of any recovery in this lawsuit (John Coles) and were amply demonstrated on cross-examination to be riddled with inaccuracies and incompleteness. Such shortcomings might well bear on the summaries' admissibility under Fed.R.Evid. 1006. Despite serious concomitant doubts about the summaries' capacity to serve as substantial evidence of anything, this Court treated such concerns as questions of credibility unassailable

when ruling on the directed verdict motions. *See e.g. Boeing,* 411 F.2d at 375.

**16.** *See supra* text § III.C.1.

**17.** Only the conspiracy inference is plausible in such a situation since experienced distributors are not expected to consistently make bad business judgments. *Southway Theatres,* 672 F.2d at 501.

1974 to May 1978 complained of only five rejections by Buena Vista; three each by Columbia, Paramount, and Fox; one by Warner Brothers; and none by United Artist/M.G.M.[18] Plaintiffs having failed to show a clear and consistent pattern of rejections by any particular distributor defendant or in favor of any particular exhibitor defendant, the jury could not have reasonably inferred a conspiracy and membership from Plaintiffs' evidence of rejections.

Plaintiffs also failed to substantiate the clear superiority of Champions' bids. Determining bids' relative quality requires the very subjective application of ambiguous standards to diverse factors.[19] *See U.S. v. Paramount Pictures*, 334 U.S. 131, 162–64, 68 S.Ct. 915, 931–32, 92 L.Ed. 1260 (1948); *Admiral Theatre*, 585 F.2d at 882–83, 885. Furthermore, given the many factors relevent to bid evaluation such as grossing potential, percentage terms, guarantees, theater quality, seating capacity, location, and performance record, one cannot assess a bid's superiority by referring to only one such factor. *See also Admiral Theatre*, 585 F.2d at 885 (seating capacity alone not determinative). Plaintiffs' practically exclusive reliance upon the size of bid guarantees therefore could not substantiate the superiority of Champions' bids.[20] Indeed, the evidence of Champions' relatively low grossing potential further eroded the substantiality of Plaintiffs' superiority theory—for the implication of licenses' percentage terms as well as the trial testimony itself indicated that grossing potential is the dominate factor determining bid quality.[21]

Given the above failure to demonstrate any systematic rejection pattern or bid superiority, this Court concluded that the jury could not reasonably infer a conspiracy and membership—or even a setting bespeaking distributor accord—from Plaintiffs' evidence concerning "superior" bid rejections.[22]

*(d) Instances of unfair treatment or bidding abuse*

The record also contained sundry examples of various distributors discriminating against or unfairly treating Champions. Given the very broad latitude afforded distributors to discriminate in licensing decisions,[23] however, Plaintiffs' could not raise a jury question as to conspiracy merely by establishing that discrimination existed. Indeed, Plaintiffs' relying upon different types of conduct by different defendants suggested that no unified conspiracy existed at all. *Cf. Admiral Theatre*, 585 F.2d at 885 (plaintiff's varying success with different distributors suggests that no conspiracy existed); *Naumkeag Theatres v. New England Theatres*, 345 F.2d 910, 915 (1st Cir.) *cert. denied* 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965) (distributors' divergent responses to plaintiff suggests no conspiracy existed). Nonetheless, this

18. Plaintiffs' Exhibit Number 233 (as amended).

19. Indeed, case law accordingly suggests that it may often be impossible to adduce evidence from which a jury could reasonably find—without speculation—that conspiratorial favoritism rather than valid business judgment caused a distributor to accept a particular bid as being "superior" to another. *Cf. U.S. v. Paramount Pictures*, 334 U.S. 131, 161–66, 68 S.Ct. 915, 931–33, 92 L.Ed.2d 1260 (1948); *Brown*, 288 F.2d at 304.

20. Plaintiffs' Exhibit Number 233 (as amended). Another significant flaw in Plaintiffs' case was that while only the rejection of *superior* bids was relevant, Plaintiffs' summary of bid rejections lumped superior and equal bids together.

21. As to the importance of grossing potential, *see also Admiral Theatre*, 585 F.2d at 885.

22. Quite analogously to the bid analysis and playoff summaries, Dr. Smith testified that distributors accepted inferior bids for five of the approximately 400 films shown during the alleged conspiracy's existence. Those five films were Buena Vista's "Jungle Book", Columbia's "The Buddy Holly Story", Paramount's "Orca, the Killer Whale", Fox's "Mother, Jugs, and Speed", and Warner Brother's "Starship Invasion". At the hearing concerning this Court's preliminary *James* ruling, Plaintiffs also cited Buena Vista's "Rescuers" and "Herbie Goes to Monte Carlo" along with Fox's "Star Wars", "Silver Streak", and "I Will, I Will". This Court considered that evidence, and dismissed it as insubstantial, under the same rationale discussed in this § III.C.1(c).

23. *See supra* text § III.C.1.

Court will briefly discuss the more important instances of unfairness Plaintiffs alleged.

■ Claiming that the Champions, Sugarland, and Baytown theaters had a similar relationship to Houston, Plaintiffs wanted the jury to infer a conspiracy from the refusal of distributors such as Columbia to give Champions licensing opportunities equal to those given the Sugarland and Baytown theaters. Plaintiffs further pointed to isolated events such as Paramount's licensing "King Kong" to another theater while Champions was still negotiating for that film and Buena Vista's cancelling Champions' award of "Herbie Goes to Monte Carlo" pursuant to Buena Vista's contractual right to do so.[24] But given an individual distributor's right to treat equal theaters unequally and to independently base its licensing decisions upon any reason or no reason at all,[25] such conduct did not substantially evidence a conspiracy as opposed to allowable independent conduct.

■ Plaintiffs also complained of adjustments between defendants such as Columbia and Loews. The record, however, illustrated that adjustments are common throughout the film distribution industry, *see also Dahl*, 448 F.2d at 20, and suggested that a distributor's allowing such adjustments when a film performs under expectation encourages higher exhibitor bids in the long run, *see also Admiral Theatre*, 585 F.2d at 886. Champions' booking agent, moreover, testified that Champions itself received many such adjustments. Plaintiffs' adjustment evidence accordingly could not help substantiate a conspiracy aimed against Champions. *See id.* at 887.

■ Apparently conceding the legitimacy of clearances when theaters compete for patrons,[26] Plaintiffs claimed that Paramount and Warner Brothers' allowing General Cinema's Greenspoint Theatre ("Greenspoint") to clear Champions on various films evidenced a conspiracy since Champions and Greenspoint did not compete for patrons. Plaintiffs based their essential premise of non-competition basically upon (1) the conclusory and self-contradicted statements by Messrs. Coles and Erickson that Champions and Greenspoint did not compete for patrons, (2) Dr. Smith's analysis of Champions and Greenspoint's simultaneous screening of "Smokey and the Bandit", and (3) deposition testimony that as a general rule clearances of more than 3.5 to 8 miles can be unnecessary. Eliciting conclusory and self-contradicted statements, offering an isolated analysis of one film, and reciting a general rule oblivious to the particular circumstances at hand could not, however, substantiate competition between Greenspoint and Champions. Indeed, other evidence established that (1) Greenspoint and Champions attracted some of the same patrons, (2) Champions was the closest similar theater north of Greenspoint, (3) Greenspoint was in a regional mall designed to draw persons from a wide area and the Champions Village community was the first population cluster northwest of that mall, and (4) Champions considered it worth $12,500 to clear Greenspoint on the film "California Suite". Given the record as a whole's failure to support Plaintiffs' premise of non-competition, the evidence concerning the Greenspoint clearances did not substantiate a conspiracy.[27]

---

24. Buena Vista awarded "Herbie Goes to Monte Carlo" to Champions in a 2 February 1977 letter. Claiming that award was an administrative error, a February 4th telegram cancelled Champions' award. Buena Vista's Bid Request Form gave Buena Vista the right to so cancel by providing: "WE ALSO RESERVE THE RIGHT TO CANCEL ANY AWARD MADE AS A RESULT OF AN ADMINISTRATIVE ERROR." Plaintiffs' Exhibit Number 123.

25. *See supra* text § III.C.1.

26. *See also e.g., A.L.B. Theatre v. Loews,* 355 F.2d 495, 501 (7th Cir.1966); *Naumkeag Theatres,* 345 F.2d at 912–13.

27. Plaintiffs also complained of Columbia's refusing to violate the clearances granted AMC and GCC over Champions on the film "Nickelodeon". Plaintiffs, however, adduced even less evidence of Champions' non-competition with those theaters or the irrationality of those clearances. The "Nickelodeon" clearance evidence therefore could not support any inference of conspiracy without impermissible jury speculation.

■ Plaintiffs also suggested that distributors' limiting the number of prints available to the Houston Exchange evidenced the conspiracy since, in Dr. Smith's opinion, distributors could make more money if they licensed more prints. Dr. Smith's opinion, however, did not attain the dignity of substantial evidence given (1) his lack of film licensing expertise,[28] (2) his analysis's misleading reliance upon individual bid guarantees rather than aggregate grossing potentials to determine a distributor's net return from licensing an additional print,[29] and (3) his conclusion's dependence upon isolated examples such as Buena Vista's limiting "Jungle Book" to six prints. Trial testimony as well as the logic of supply and demand, moreover, indicated that limiting the number of prints increased the value of each print.[30] Plaintiffs' print limitation evidence accordingly failed to substantiate a conspiracy.

■ Plaintiffs finally contended that Buena Vista's licensing to the so called "GCC Track" evidenced a conspiracy since licensing to that track entailed continually rejecting other theaters' "superior" bids. Just as before, however, Plaintiffs failed to substantiate their premise of the rejected bids' superiority. *See supra* text § III.C. 1(c). Given further that the same booking agent usually bid for some of the track theaters and that distributors can benefit from the consistency of track booking,[31] Plaintiffs' track evidence failed to substantiate a conspiracy.

**(e) Distributors' awareness of the exhibitor split**

Employing yet another angle, Plaintiffs attempted to tie the distributors to the exhibitors' alleged split conspiracy.

■ Plaintiffs accordingly submitted evidence indicating United Artist/M.G.M.,

Buena Vista, and Columbia's awareness of an exhibitor split existing in Houston. Such knowledge alone, however, could not substantiate the distributors' *participation* in that conspiracy—especially given the record's concession that distributors did not attend the split meetings and that distributors often licensed films contrary to the film allocations set forth on the Dallas split meeting's blackboard. *Admiral Theatre*, 585 F.2d at 887.

■ While agreeing that a split's purpose is to drive down the price distributors can charge for their licenses, Plaintiffs maintained that Buena Vista, Fox, and Columbia nonetheless licensed certain films to exhibitors who bid pursuant to the split.[32] Such evidence of a distributor's licensing to a split member and thus becoming a knowing victim of the exhibitors' conspiracy, however, could not substantiate the distributor's *participation* in the conspiracy. *Perma-Life Mufflers v. International Parts*, 392 U.S. 134, 154, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968), *overruled in other part Copperweld Corp. v. Independence Tube*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

■ This Court finally notes the comments Plaintiffs attributed to distributors—such as a Fox representative's saying he was receiving "pressure from people" to force Champions to bid in the Houston Exchange for "Star Wars" and a United Artists representative's saying "The Big Man" did not want Champions in on certain films. Even speculating in Plaintiffs' favor that such comments reflected complaints by exhibitors and that distributors restricted Champions' access to their films in response to such complaints, those comments could not substantiate a distributor-exhibi-

---

**28.** *See infra* text § III.C.1(f).

**29.** *See supra* text § III.C.1(c).

**30.** *Cf. also A.L.B. Theatre*, 355 F.2d at 494 (film rental value decreases as public exposure increases).

**31.** *See generally U.S. v. Capital Services*, 568 F.Supp. 134, 138 (E.D.Wis.1983) *aff'd* 756 F.2d

502 (1985) (citing the economic benefits distributors gain from consistently licensing to a track of theaters).

**32.** Plaintiffs suggested that the Galleria Theatre was improperly awarded certain Buena Vista films and Fox's "Star Wars" consistent with the split's allocations, and that Columbia awarded "The Buddy Holly Story" licenses consistent with the split's allocation.

tor conspiracy to restrict Champions' access to high quality first-run films. *Monsanto*, 465 U.S. at 763–64, 768–69, 104 S.Ct. at 1470–71, 1472–73, 79 L.Ed.2d at 782, 785, 788. To raise the question of a conspiracy with such comments, Plaintiffs had to adduce evidence tending to exclude the possibility that the distributor was acting independently in restricting Champions' access to its films—that is, evidence reasonably tending to prove that the distributor and exhibitor had a conscious commitment to that common scheme designed to achieve an unlawful objective. *Id.* Plaintiffs having failed to produce such supporting evidence, those comments could not substantiate a conspiracy.

### (f) Houston market conditions

Plaintiffs also suggested that the jury could reasonably infer conspiracy and membership from certain conditions existing in the film distribution market.

■ Dr. Smith, for example, testified that in his opinion the Clear Lake Theatre ("Clear Lake") and Champions were equivalent theaters, and yet Clear Lake got more "good" films than Champions did. Asserting that such a situation would not arise in a truly competitive distribution market, he accordingly inferred that a conspiracy existed and that the distributors were members of that conspiracy. This Court extensively questioned Dr. Smith, however, and concluded that he had no adequate foundation for his opinions concerning the relative quality of theaters and their films, market power in Houston, or even the film licensing industry in general. *Cf. Admiral Theatre*, 585 F.2d at 894–96. Thus deprived of their essential premise, Dr. Smith's conspiracy and membership conclusions substantiated nothing.[33]

■ Based upon the testimony of witnesses such as Mr. Coles that the distribu-

tion market's structure prevented successful exhibitor splits absent distributor involvement, Plaintiffs wanted the jury to infer from the exhibitors' split agreement that the distributors were conspiratorially involved. Even if the record supported the underlying assumption of a successful split existing, the jury could not have reasonably drawn the conspiratorial inference concerning distributors since the Fifth Circuit maintains that distributor involvement is not necessary to effectuate splitting among exhibitors. *Southway Theatres*, 672 F.2d at 492.

### (g) Conspiracy conclusion

Throughout Plaintiffs' presentation of their case, this Court sought some substantial evidence of a § 1 conspiracy. As the above discussion explains, however, Plaintiffs never produced any such evidence. Even aggregating their evidence together, Plaintiffs failed to substantiate a setting in which the defendants' parallel actions bespoke accord. Viewed as a whole, Plaintiffs' evidence simply failed to attain the required dignity of substantial evidence which could allow the jury to reasonably infer, without resorting to speculation, the existence and membership of any alleged conspiracy. This Court accordingly had to direct the verdict on Plaintiffs' § 1 claims.

### 2. Restraints

Even if the record somehow substantiated a conspiracy's existence, Plaintiffs failed to raise a jury question as to the legality of any potential conspiracy's restraints.[34]

### (a) Territorial-type restraints instigated by a distributor

■ Plaintiffs' case possibly involved restrictions somewhat analogous to territorial restraints which manufacturers impose upon their dealers—i.e., Plaintiffs might

---

**33.** This Court did not reject the possibility that a non-competitive distribution atmosphere might establish a setting which bespeaks accord. It merely ruled that Plaintiffs had failed to evidence such an atmosphere.

**34.** *See supra* n. 14. Unlike in § III.C.1, however, this Court's explanation here deals with

each classification separately since the Rule of Reason or Per Se Rule's applicability can differ with different conspiracy classifications. *See e.g.* L. Sullivan, *Antitrust* 232, 256 (1977) (essential to distinguish concerted refusal to deal and boycott when assessing legality of restraints).

have theorized that some distributor(s) licensed films only to those exhibitors who agreed to distributor-imposed restrictions such as bidding in the Houston Exchange, competing for a limited number of prints, and participating in a system of combined bidding/negotiations rather than pure bidding.[35]

The Rule of Reason governs such concerted vertical action on non-price restrictions. *E.g. Monsanto*, 465 U.S. at 761–62, 104 S.Ct. at 1469–70, 79 L.Ed.2d at 784; *see also Mendelovitz*, 693 F.2d at 575 & n. 7; *Transource Int'l. v. Trinity Industries*, 725 F.2d 274, 279–80 (5th Cir.1984); *cf. Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 50–59, 97 S.Ct. 2549, 2557–62, 53 L.Ed.2d 568 (1977). Under that rule,

> [t]he true test of legality is whether the restriction imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

*Chicago Bd. of Trade v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); *accord GTE Sylvania*, 433 U.S. at 50 n. 15, 97 S.Ct. at 2557 n. 15; *Hornsby Oil*, 714 F.2d at 1392 n. 7; *E.A. McQuade Tours v. Consolidated Air Tour Manual Cmte.*, 467 F.2d 178, 185 (5th Cir.1972) *cert. denied* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). Plaintiffs accordingly had to produce evidence concerning these restrictions and their relevant circumstances from which the jury could reasonably find that the defendants' conduct, on balance, had an anticompetitive effect in a defined product and geographic market. *E.g., Hornsby Oil*, 714 F.2d at 1392; *Mendelovitz*, 693 F.2d at 575–76.

By failing to adduce substantial evidence of this case's relevant geographic market,[36] however, Plaintiffs foreclosed the jury's ever applying the Rule of Reason.

Plaintiffs further failed to substantiate any anticompetitive effect of these restraints. Although Dr. Smith did conclude that something funny or anticompetitive was going on in the Houston distribution market, his expert opinion was for the most part unfounded.[37] Moreover, his testimony as to specific restrictions such as print limits unduly focused upon how they lost profits for the distributors. Such questioning of distributors' intelligence in imposing certain restrictions did not substantiate the restrictions' anticompetitive effect.[38] Thus even if the jury could have applied the Rule of Reason, they could not, without relying on unfounded testimony or resorting to speculation, have found these restrictions unreasonable.[38.5]

---

35. The record substantiated that distributors announced such conditions in advance and accepted as licensees only those exhibitors who fulfilled those conditions. Under the *Colgate* doctrine, however, such conduct can not constitute an *agreement* violating the Sherman Act. *E.g., Monsanto Co. v. Spray-Rite Service*, 465 U.S. 752, 760–62, 104 S.Ct. 1464, 1469–70, 79 L.Ed.2d 775, 783–84 (1984); *See also generally supra* text § III.C.1. For the purposes of the present discussion, however, this Court assumes—contrary to its conclusion in § III.C.1—that Plaintiffs somehow presented a jury question as to the existence of a distributor/exhibitor agreement or conspiracy involving such territorial-type restrictions.

36. *See supra* text § III.A.

37. *See supra* text § III.C.1(f).

38. *See also e.g., supra* text § III.C.1(d) as to the insufficiency of Dr. Smith's testimony concerning the distributors' print limitations.

38.5. The defendants further argued that these territorial-type restrictions were inherently reasonable since (1) despite Champions' claim of being in an area distinct from the Houston Exchange, requiring more theaters to bid against each other always encourages rather than discourages competition, and (2) such intrabrand restraints cannot be unreasonably anticompetitive. Examples such as requiring Nacogdoches and New York City theaters to bid against each other illustrate the fallacy of suggesting that requiring theaters in two distinct areas to bid against each other is always procompetitive. And although purely intrabrand restrictions are reasonable when interbrand competition suffers no injury, *e.g. Hornsby Oil*, 714 F.2d at 1394; *Mendelovitz*, 693 F.2d at 575–76, Plaintiffs potentially claimed that all major distributors adopted the same territorial-type restrictions. Since the restraints therefore took on an interbrand aspect as well, this Court could not accept the defendants' argument concerning purely intrabrand restrictions. Thus rejecting those affirmative arguments of reasonableness, this Court's ruling centered upon Plaintiffs' failure to adduce evidence from which the jury could permissibly infer *un*reasonableness.

Directing the verdict as to this potential conspiracy theory was therefore necessary. *See e.g., Mendelovitz,* 693 F.2d at 574–76.

**(b) Concerted refusal to deal by the distributors**

■ Perhaps Plaintiffs postulated a conspiracy between distributors—without involving exhibitors—to restrict the flow of high quality first-run films to exhibitors such as Champions. Such a conspiracy between businesses at the supply level alone would constitute a concerted refusal to deal.[39] *E.g., Southway Theatres,* 672 F.2d at 503.

■ That concerted action would represent the conspiring distributors' attempt to exact better licensing terms from the exhibitors—and would accordingly entail vertical restraints against exhibitors rather than horizontal restraints against other competing distributors. L. Sullivan, *Antitrust* 257 (1977). Such agreements among suppliers fixing collateral terms or standarizing sales procedures sometimes increase price competition by, for example, reducing confusing variations between products. *Id.* at 257–59. Other agreements may be competitively neutral; and still others might harm competition. *Id.* Since concerted refusals to deal therefore do not threaten

competition as consistently as do classic boycotts (which impose horizontal restraints), concerted refusals to deal are not per se illegal under the Sherman Act. *Blackburn v. Crum & Forster,* 611 F.2d 102, 104 (5th Cir.) *cert. denied* 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980); *Gould v. Control Laser,* 462 F.Supp. 685, 691 (M.D.Fla.1978), *aff'd. in part and appeal dismissed in part,* 650 F.2d 617 (5th Cir.1981); *see generally* L. Sullivan at 231–32, 236, 256–59.

■ Since per se treatment was therefore inappropriate, the Rule of Reason governed Plaintiffs' concerted refusal to deal claims. For the same general reasons explained above in § III.C.2(a), this Court had to conclude that Plaintiffs' concerted refusal to deal evidence failed to substantiate a violation under the Rule of Reason.[40]

**(c) Boycott by the exhibitors**

■ Plaintiffs might also have claimed that in an attempt to drive non-conspiring exhibitors such as Champions out of business, an exhibitor defendant conspired with each distributor separately to restrict the non-conspiring exhibitors' access to high quality first-run films. Such a conspiracy—where a firm at one level attacks its

---

**39.** Noting that the distributors did not totally refuse to deal with Champions on any terms, but rather simply refused to deal with Champions on the terms Champions desired, defendants argued that § 1 concerted refusal to deal and boycott analyses did not apply. This Court rejected that contention, for Plaintiffs complained that Champions was just like theatres in outlying areas such as Sugarland and Baytown, and yet the distributors refused to treat Champions as such an outlying theater (i.e., refused to license films to Champions on a non-competitive negotiation basis outside in the Houston Exchange). Such a collective refusal to deal with Champions on fair or substantially equal terms could be characterized as concerted action proscribed by § 1. *Northwest Wholesale Stationers v. Pacific Stationery & Printing,* 53 U.S.L.W. 4733, 4736 n. 6; *St. Bernard General Hospital,* 712 F.2d at 987.

**40.** Some cases further suggest that Plaintiffs had to establish an anticompetitive motive on the distributors' part to prevail on the concerted refusal to deal claim. *Southway Theatres,* 672 F.2d at 503; *see also Blackburn,* 611 F.2d at 104

and cases cited therein. Plaintiffs adduced insufficient proof of such anticompetitive animous. Indeed, the legitimate business reasons for the distributors' conduct, *see generally supra* text § III.C.1, defeated any charge of such animous. *Blackburn,* 611 F.2d at 105. This line of cases therefore might have provided another ground for directing the verdict as to Plaintiffs' concerted refusal to deal claim.

Rather than establishing a specific "motive" requirement for analyzing refusals to deal under the Rule of Reason, however, these cases may well reflect the courts' method of avoiding precedents which sloppily applied the Per Se Rule to concerted refusals to deal and boycotts interchangeably. *Cf. e.g., Blackburn,* 611 F.2d at 105 (concluding that since no anti-competitive motive was shown, the Per Se Rule did not make the defendant's conduct illegal); *St. Bernard General Hospital,* 712 F.2d at 988 (Rule of Reason rather than Per Se Rule applies to concerted refusal when no anticompetitive motive shown). This Court accordingly did not direct the verdict on the concerted refusal to deal claim simply because Plaintiffs failed to substantiate anticompetitive animous.

competitors at that same level by taking concerted action to deprive those competitors of necessary supplies—would constitute a classic boycott.[41] *Southway Theatres*, 672 F.2d at 498–99; L. Sullivan at 230. Moreover, since more than one exhibitor could join such a boycott, Plaintiffs' case would warrant boycott analysis if Plaintiffs had established that the distributors participated in the exhibitors' split by agreeing to deny licenses to the non-splitting exhibitors. *Southway Theatres*, 672 F.2d at 492.

The fundamental problem with allowing Plaintiffs to characterize their case against the exhibitor defendants as such an anticompetitive "boycott"—the equivalent of yelling "fire" in the halls of traditional antitrust jurisprudence—was that Plaintiffs vigorously maintained throughout trial that Champions was *not* the exhibitor defendants' competitor. *Cf. Naumkeag Theatres*, 345 F.2d at 914 (antitrust plaintiff cannot allege existence of competition between theaters in its first claim and then deny such competition's existence in its second claim). Similarly disparaging Plaintiffs' concomitant request for per se treatment was the fact that courts center their harsh per se condemnation of boycotts upon the pernicious anticompetitive effect of firms depriving *their competitors* of necessary supplies or customers. *Cf. e.g. Northern Pacific Ry. v. U.S.*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 211, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959); *Northwest Wholesale Stationers v. Pacific Stationery & Printing*, —— U.S. ——, —— ——, 105 S.Ct. 2613, 2617–19, 86 L.Ed.2d 202 (1985); *Blackburn*, 611 F.2d at 104; *Mendelovitz*,

693 F.2d at 575. Ignoring those fatal flaws, Plaintiffs nonetheless invoked the per se approach of *Klor's* and its progeny. Although willing to consider Plaintiffs' case as a boycott of sorts, this Court had to decline Plaintiffs' invitation to so blindly apply the Per Se Rule.

■ The per se condemnation of boycotts rests upon the pernicious anticompetitive effect that a boycott has upon the particular market in which the boycott instigators and boycott victims principally compete. *Cf. id.* Yet Plaintiffs expressly limited their case to the distribution market.[42] By thus disavowing any complaints about the market in which the boycott's instigators and victims principally competed—i.e., the exhibition market—Plaintiffs rendered the Per Se Rule inapposite. Indeed, given Plaintiffs' confining their complaints to the distribution market, this Court's antitrust analysis had to focus upon effects in the distribution market caused by the vertical restraints between Champions and the distributors rather than effects in the exhibition market caused by the horizontal restraints between Champions and the exhibitor defendants. Thus concentrating upon the vertical aspects of this conspiracy's restraints, the Rule of Reason rather Per Se Rule applied. *Cf. Blackburn*, 611 F.2d at 104; *Mendelovitz*, 693 F.2d at 575. Since Plaintiffs failed to substantiate a Rule of Reason violation,[43] directing the verdict was necessary.

■ Even if this case did concern the exhibition market, the traditional Per Se Rule would not apply. The Fifth Circuit has for years questioned the continued vitality of that per se approach in cases such as this involving a vertical link between

---

**41.** Note that unlike concerted refusals to deal, boycott conspiracies entail agreements between co-conspirators at *different* levels in the chain of commerce. *Southway Theatres*, 672 F.2d at 503. Also distinguishing their concerted refusal to deal claim, Plaintiffs need not have shown that any distributors conspired between themselves. To invoke boycott analysis, Plaintiffs only had to show that one exhibitor made separate agreements with numerous distributors to deprive Champions of necessary films. *Southway Theatres*, 672 F.2d at 499, 500, 503; *cf.*

*Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 211, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959).

**42.** *See* Transcript of 29 August 1985 Pretrial Conference, p. 37, lines 20–24.

**43.** As to the reasonableness of the two uniquely exhibitor-instigated restraints—clearances and splitting—*see infra* text § III.C.2(c); as to the reasonableness of the other restraints, *see supra* text § III.C.2(a).

suppliers and customers. *E.g., St. Bernard General Hospital,* 712 F.2d at 986; *Southway Theatres,* 672 F.2d at 499 (Dist.Ct. opinion) verses 492 n. 5 (5th Cir. opinion); *see also Mendelovitz,* 693 F.2d at 576–78; *J.J. Theatres v. 20th Century Fox Film,* 212 F.2d 840, 842 (2nd Cir.1954). More recently, the U.S. Supreme Court has held that "a plaintiff seeking application of the *per se* rule must present a threshold case that the alleged activity falls into a category likely to have predominately anticompetitive effects." *Northwest Wholesale Stationers,* —— U.S. at ——, 105 S.Ct. at 2621;[44] *see also NCAA v. Bd. of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 2960–62, 82 L.Ed.2d 70 (1984); *Broadcast Music v. Columbia Broadcasting System,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979) (the "ASCAP" case). Although the boycott conspiracy's having market power, enjoying exclusive access to films, or otherwise placing Champions in a severe competitive disadvantage would likely place it in the per se category, *see Northeast Wholesale Stationers,* —— U.S. at ——, 105 S.Ct. at 2620 & n. 6, Plaintiffs failed to substantiate such power, access, or disadvantage. For example: the conspiracy did not enjoy exclusive access to films since, analogous to the restricted access afforded the plaintiff in *Northwest Wholesale Stationers,* the boycott conspiracy here simply prevented Champions from getting films on the favorable terms Champions desired. The boycott restraints—e.g., requiring Champions and exhibitor defendants to bid in the Houston Exchange, limiting the number of prints, clearing, adjusting, and maintaining a combined competitive negotiation/bid system—might well have had a positive or neutral rather than negative effect on competition. This Court accordingly concluded that Plaintiffs failed to make the threshold case necessary to invoke the Per Se Rule.

 Although this Court has already explained its rationale for directing the verdict under the Rule of Reason,[45] two uniquely exhibitor-instigated restrictions— clearances and splitting—warrant special mention here. Since Plaintiffs failed to substantiate the lack of competition for patrons between Champions and the clearing theaters,[46] Plaintiffs could not establish the clearances' unreasonableness on lack-of-competition grounds. *Naumkeag Theatres,* 345 F.2d at 912–13; *see also A.L.B. Theatre v. Loews, Inc.,* 355 F.2d 495, 501 (7th Cir.1966). Plaintiffs also elicited Dr. Smith's opinion that while Champions could reasonably clear Greenspoint, Greenspoint's superior market power made it unreasonable for Greenspoint to clear Champions. That testimony did not raise a jury question as to reasonableness since (1) Dr. Smith had no adequate foundation for premises such as Greenspoint's market power,[47] (2) his conclusory testimony on this point did not provide an explanation adequate enough to allow a reasoned assessment of anticompetitive effects and principled application of the Rule of Reason by the jury, and most fundamentally (3) his unreasonableness conclusion confused the inequity of Greenspoint's power to demand clearances in general with the reasonable scope of the specific clearances over Champions demanded in this particular case. And while a distributor-enforced split would surely restrain trade unreasonable in some cases, the split alleged here could not have unreasonably restrained Plaintiffs' trade since John Coles admitted the split did not restrain Champions' efforts to obtain films. Thus even considering the uniquely exhibitor-instigated restrictions,

---

**44.** Although the *Northwest Wholesale Stationers* opinion used the terms "concerted refusal to deal" and "boycott" somewhat interchangeably, the facts in essence presented firms at one level (office supply retailers) conspiring with a supplier (their purchasing cooperative) to deny a competitor at that level (an office supply dealer wishing, in part, to purchase from the cooperative and sell retail) equal access to that supplier. Given that strong resemblance to a classic boycott, this Court applied *Northwest Wholesale Stationers'* holding to the boycott analysis at hand.

**45.** *See supra* text § III.C.2(a).

**46.** *Supra* text § III.C.1(d).

**47.** *See also supra* text § III.C.1(f).

this Court had to conclude that no reasonable juror could find the boycott's restraints unreasonable in that they on balance adversely affected competition in a defined product and geographic market.

### (d) Restraint conclusion

Not only did Plaintiffs inadequately segregate the complained of conspiracy's vertical and horizontal aspects, but they further failed to produce sufficient evidence to substantiate the unlawfulness of any potential conspiracy's restraints. That failure further necessitated directing the verdict on Plaintiffs' § 1 claims.

### D. Damages

Even if Plaintiffs had substantiated some § 1 or § 2 violation, their case could not go to the jury unless they had sufficiently evidenced both the fact and amount of damage caused by that violation.

### 1. Fact of Damage

■ An antitrust plaintiff has to prove to a fair degree of certainty and with some particularity that the defendant's antitrust violation *in fact* caused actual damages to the plaintiff. *Pierce*, 753 F.2d at 435; *Multiflex v. Samuel Moore & Co.*, 709 F.2d 980, 988–89 (5th Cir.1983) *cert. denied* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *Cooper Liquor v. Adolph Coors Co.*, 624 F.2d 575, 580 (5th Cir.1980). Thus to avoid a directed verdict, Plaintiffs had to adduce evidence from which a reasonable and fair minded person could find such a causal relationship between defendants' conduct and Champions' losses. *Shumate & Co. v. National Assn. of Securities Dealers*, 509 F.2d 147, 152–54 (5th Cir.) *cert. denied* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

■ Since the conclusory causation allegations made by witnesses such as Mr. Coles could not satisfy Plaintiffs' evidentiary burden, *see id.* at 153, this Court turned to the testimony of Plaintiffs' causation expert. Dr. Smith's causation theory essentially boiled down to the following syllo-

gism: (1) Champions suffered a financial loss since the Houston distribution market was not truly competitive and Champions could theoretically have earned more money under a truly competitive market, (2) the various defendants often engaged in assorted anticompetitive practices, and thus (3) the defendants' conduct caused all of Champions' theoretical losses. Such an "after-the-conduct-therefore-because-of-it" argument cannot preclude a directed verdict. *Id.* at 153–54.

Dr. Smith's reliance upon unfounded assumptions such as the Houston distribution market's lack of competition [48] and the anticompetitiveness of certain practices [49] further prevented his testimony from substantiating any causal connection. *Pierce*, 753 F.2d at 437. Dr. Smith also fatally failed to address other likely causes of Champions' poor performance such as its management's lack of prior research and experience. *See Schumate*, 509 F.2d at 154. Finally, Plaintiffs' evidence provided the jury no method short of speculation to distinguish or even determine how any specific antitrust violation (e.g., § 2 monopolization as opposed to § 1 boycott) or any specific anticompetitive conduct (e.g., the Northline/Greenspoint clearances or the Houston split) in fact injured Champions.

The record thus containing only unfounded and speculative causation evidence, this Court had to direct the verdict. *Pierce*, 753 F.2d at 437; *Shumate*, 509 F.2d at 152–55; *see also Multiflex*, 709 F.2d at 989–90 (reversing jury's antitrust damage award because plaintiff failed to sufficiently evidence causation).

### 2. Amount of Damage

Even if Plaintiffs had sufficiently evidenced the fact of damage, they had to further evidence the *amount* of that damage. *Multiflex*, 709 F.2d at 995. Although Plaintiffs enjoyed a relaxed burden of proof on this second requirement, their evidence—i.e., Dr. Smith's model—had to provide the jury a rational basis to assess the

---

**48.** *See supra* text § III.C.1(f).

**49.** *See supra* text § III.C.2.

damage amount. *Id.; Cooper Liquor*, 624 F.2d at 580; *MCI Communications v. AT & T*, 708 F.2d 1081, 1161 (7th Cir.1983) (as modified) *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946) (antitrust jury "may not render a verdict based on speculation or guess work").

Plaintiffs' damage model failed.

To begin with, the model relied upon too many inadequately supported assumptions. For example, Dr. Smith based the model upon the Clear Lake Theatre ("Clear Lake") because he believed that Clear Lake and Champions were equivalent theaters and that Clear Lake obtained more "good" films than Champions. Dr. Smith, however, had no adequate foundation for those crucial premises concerning theater and film quality. *Supra* text § III.C.1(f). Dr. Smith also based the model's damage formulas upon the assumption that the conspiring distributors did not require Clear Lake to bid in the Houston Exchange. But at least one conspiring distributor—Buena Vista—did require Clear Lake to bid in the Houston Exchange. Finally, Dr. Smith obtained much of the model's input data from the summaries John Coles prepared. Yet as the cross-examination of Mr. Coles and Dr. Smith demonstrated, those summaries were riddled with inaccuracies and incompleteness. That inadequate foundation left Plaintiffs' model resting upon speculation and guesswork. Since any jury award utilizing the model would necessarily have suffered the same infirmity, directing the verdict was necessary. *Cf. MCI Communications*, 708 F.2d at 1164–66 (reversing antitrust award when major premise of damage study was incorrect or study lacked adequate foundation).

Even if the model itself was not so inherently infirmed, applying it to the particulars of this case would have required jury speculation or guesswork. For example, although Plaintiffs' various liability theories rested upon distinct legal underpinnings such as monopolization, boycott, and territorial-type restraints, their damage model provided no rational basis to distinguish awards under those separate theories. The jury therefore could not reasonably base any particular award upon that model. *Multiflex*, 709 F.2d at 997–99. Moreover, the model calculated a lump damage amount for the combined effects of practices such as splitting, clearing, and limiting the number of film prints. Yet the jury could easily have determined that practices such as splitting did not injure Champions [50] or that practices such as limiting prints were lawful.[51] Since Plaintiffs' model provided the jury no basis to determine the effect on damages if it found one and none of the challenged practices innoxious, the model could not support a jury award. *MCI Communications*, 708 F.2d at 1160–63; *ILC Peripherals v. IBM*, 458 F.Supp. 423, 434 (N.D.Calf.1978), *aff'd*. 636 F.2d 1188 (1980) *cert. denied* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). Finally,[52] the model based its lump damage amount upon the combined conduct of all defendants. Yet given the extraordinarily insufficient conspiracy evidence against defendants such as Loews and United Artists, the jury could have easily found particular defendants innocent. Since the model left the jury no reasonable or principled way to adjust the damage amount if it so found any defendants innocent, the model could not support a jury award. *Id.*

The record thus lacking adequate proof of the amount of Plaintiffs' damages, this Court had to direct the verdict. *See also Admiral Theatre*, 585 F.2d at 894–96.

---

**50.** *See supra* text § III.C.2(c).

**51.** *See supra* text § III.C.2(a) & (d).

**52.** Defendants further argued, with much case law support, that Plaintiffs could not recover concerning films for which Champions never bid. But given the evidence of Champions' out-

standing requests/offers to separately negotiate for films, this Court rejected the defendants' contention that Plaintiffs had failed to substantiate Champions' claim of having made legally sufficient demands concerning the unbid for films. *See Admiral Theatre*, 585 F.2d at 893–94; *J.J. Theatres*, 212 F.2d at 845.

### E. Antitrust Conclusion

■ As the above discussion demonstrates, this Court searched in vain to uncover a viable antitrust claim lurking within Plaintiffs' case. The only thing Plaintiffs really substantiated was that Champions did not get all the high quality first-run films it wanted on the favorable terms it desired. Such a showing, however, did not make a submissable case of an antitrust violation.[53]

### IV. TORTIOUS INTERFERENCE CLAIMS

■ Plaintiffs also alleged that the defendants tortiously interfered with valuable business and contractual relationships between Plaintiffs and others. To maintain their contractual interference claim, Plaintiffs had to show:

(1) that a contract subject to interference existed;

(2) that the defendant intentionally and willfully interfered with that contract;

(3) that that interference proximately caused Plaintiffs damage; and

(4) the amount of Plaintiffs' actual damage or loss.

*E.g. Deauville Corp. v. Federated Dept. Stores,* 756 F.2d 1183, 1194–95 (5th Cir. 1985). To maintain their interference with business relationships claim, Plaintiffs had to show:

(1) that there was a "reasonable probability" that Plaintiffs would have entered into a contractual relationship;

(2) that with the purpose of harming Plaintiffs, the defendant acted maliciously by intentionally preventing that contractual relationship from occurring;

(3) that the defendant's action was not privilege or justified; and

(4) that the defendant's action caused Plaintiffs actual damage or harm.

*E.g., id.* at 1196. The record, however, utterly failed to substantiate those elements as to any defendant. Directing the verdict was therefore necessary.[54] *E.g., Boeing,* 411 F.2d at 374–75.

### V. DIRECTED VERDICT CONCLUSION

For the above reasons, this Court found it necessary to grant the defendants' motions for a directed verdict.

---

**53.** Similar situations have plagued courts in the past. *E.g., Admiral Theatre,* 585 F.2d at 887–88; *Dahl,* 448 F.2d at 19; *A.L.B. Theatre,* 355 F.2d at 500–02.

**54.** Indeed, probably recognizing their evidentiary failure here, Plaintiffs did not defend any tortious interference claim at the directed verdict hearings.